**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STEPHANIE FELL
c/o Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street 8th Floor
New York, NY 10013

STEPHANIE GILLIARD
c/o Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street 8th Floor
New York, NY 10013

L.L. SMITH
c/o Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street 8th Floor
New York, NY 10013, and

MAHRI STAINNAK
c/o Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street 8th Floor
New York, NY 10013,

*individually and on behalf of all others*
*similarly situated*,

                     Plaintiffs,

     v.

DONALD J. TRUMP, in his official capacity
as President of the United States
1600 Pennsylvania Avenue NW
Washington, DC 20500;

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street NW
Washington, DC 20415;

SCOTT KUPOR, in his official capacity as
Director of the Office of Personnel
Management
1900 E Street NW
Washington, DC 20415;

OFFICE OF MANAGEMENT AND
BUDGET
725 17th Street NW
Washington, DC 20503;

Case No.  1:25-cv-4206

**CLASS ACTION COMPLAINT FOR**
**INJUNCTIVE AND DECLARATORY**
**RELIEF AND DAMAGES**

**DEMAND FOR JURY TRIAL**

RUSSELL VOUGHT, in his official capacity
as Director of the Office of Management and
Budget
725 17th Street NW
Washington, DC 20503;

DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530;

PAMELA BONDI, in her official capacity as
Attorney General of the Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530;

DEPARTMENT OF AGRICULTURE
1400 Independence Avenue SW
Washington, DC 20250;

BROOKE ROLLINS, in her official capacity
as Secretary of Agriculture
1400 Independence Avenue SW
Washington, DC 20250;

CENTRAL INTELLIGENCE AGENCY
930 Dolley Madison Blvd.
McLean, VA 22101;

JOHN L. RATCLIFFE, in his official capacity
as Director of the Central Intelligence Agency
930 Dolley Madison Blvd.
McLean, VA 22101;

DEPARTMENT OF COMMERCE
1401 Constitution Avenue NW
Washington, DC 20230;

HOWARD LUTNICK, in his official capacity
as Secretary of Commerce
1401 Constitution Avenue NW
Washington, DC 20230;

COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, NW
Washington, DC 20581

CAROLINE D. PHAM, in her official capacity
as Acting Chairman of the Commodity Futures
Trading Commission
1155 21st Street, NW
Washington, DC 20581

DEPARTMENT OF DEFENSE
1400 Defense Pentagon
Washington, DC 20301-1400;

PETE HEGSETH, in his official capacity as
Secretary of Defense
1400 Defense Pentagon
Washington, DC 20301-1400;

DEPARTMENT OF EDUCATION
400 Maryland Avenue SW
Washington, DC 20202;

LINDA McMAHON, in her official capacity
as Secretary of Education
400 Maryland Avenue SW
Washington, DC 20202;

DEPARTMENT OF ENERGY
1000 Independence Avenue SW
Washington, DC 20585;

CHRIS WRIGHT, in his official capacity as
Secretary of Energy
1000 Independence Avenue SW
Washington, DC 20585;

ENVIRONMENTAL PROTECTION
AGENCY
1200 Pennsylvania Avenue NW
Washington, DC 20460;

LEE ZELDIN, in his official capacity as
Administrator of the Environmental Protection
Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460;

FEDERAL AVIATION ADMINISTRATION
800 Independence Avenue SW
Washington, DC 20591;

BRYAN BEDFORD, in his official capacity as
Administrator of the Federal Aviation
Administration
800 Independence Avenue SW
Washington, DC 20591;

FEDERAL RESERVE BOARD
20th & Constitution Avenue NW
Washington, DC 20551;

JEROME H. POWELL, in his official capacity

as Chairman of the Federal Reserve Board
20th & Constitution Avenue NW
Washington, DC 20551;

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue NW
Washington, DC 20580;

ANDREW N. FERGUSON, in his official
capacity as Chairman of the Federal Trade
Commission
600 Pennsylvania Avenue NW
Washington, DC 20580;

FOOD AND DRUG ADMINISTRATION
10903 New Hampshire Avenue
Silver Spring, MD 20993;

MARTIN A. MAKARY, in his official
capacity as Commissioner of the Food and
Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993;

DEPARTMENT OF HEALTH AND HUMAN
SERVICES
200 Independence Avenue SW
Washington, DC 20201;

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services
200 Independence Avenue SW
Washington, DC 20201;

DEPARTMENT OF HOMELAND
SECURITY
245 Murray Lane SW
Washington, DC 20528;

KRISTI NOEM, in her official capacity as
Secretary of the Department of Homeland
Security
245 Murray Lane SW
Washington, DC 20528;

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT
451 Seventh Street SW
Washington, DC 20410;

SCOTT TURNER, in his official capacity as
Secretary of Housing and Urban Development

451 Seventh Street SW
Washington, DC 20410;

DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240;

DOUG BURGUM, in his official capacity as
Secretary of the Interior
1849 C Street NW
Washington, DC 20240;

DEPARTMENT OF LABOR
200 Constitution Avenue NW
Washington, DC 20210;

LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of Labor
200 Constitution Avenue NW
Washington, DC 20210;

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION
300 E Street SW
Suite 5R30
Washington, DC 20546;

SEAN DUFFY, in his official capacity as
Acting Administrator of the National
Aeronautics and Space Administration
300 E Street SW
Suite 5R30
Washington, DC 20546;

NATIONAL INSTITUTES OF HEALTH
9000 Rockville Pike
Bethesda, MD 20892;

JAY BHATTACHARYA, in his official
capacity as Director of the National Institutes
of Health
9000 Rockville Pike
Bethesda, MD 20892;

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
1500 Tysons McLean Dr.
McLean, VA 22102;

TULSI GABBARD, in her official capacity as
Director of National Intelligence
1500 Tysons McLean Dr.
McLean, VA 22102;

DEPARTMENT OF STATE
2201 C Street, NW
Washington, DC 20520;

MARCO RUBIO, in his official capacity as
Secretary of State,
2201 C Street, NW
Washington, DC 20520;

DEPARTMENT OF TRANSPORTATION
1200 New Jersey Avenue SE
Washington, DC 20590;

SEAN DUFFY, in his official capacity as
Secretary of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590;

DEPARTMENT OF THE TREASURY
1500 Pennsylvania Avenue NW
Washington, DC 20220;

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury
1500 Pennsylvania Avenue NW
Washington, DC 20220;

DEPARTMENT OF VETERANS AFFAIRS
810 Vermont Avenue NW
Washington, DC 20420;

DOUGLAS A. COLLINS, in his official
capacity as Secretary of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420;

Defendants.

Plaintiffs Stephanie Fell, Stephanie Gilliard, L.L. Smith, and Mahri Stainnak ("Plaintiffs"), are former federal employees who were targeted for separation from the federal government pursuant to Executive Order 14151 ("EO 14151"), *Ending Radical and Wasteful Government DEI Programs and Preferences*,[1] Executive Order 14173 ("EO 14173"), *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,[2] (collectively, "anti-DEI EOs") along with their implementing directives.

Plaintiffs bring this action individually and on behalf of a class of similarly-situated federal employees ("the Class") against Defendant Donald J. Trump ("President Trump") and federal officials and agencies identified below (collectively, "Defendants") on the following grounds: (1) discrimination based on perceived political affiliations in violation of the First Amendment to the United States Constitution (all Plaintiffs); (2) discrimination based on advocacy or perceived advocacy for protected racial and/or gender groups (i.e., people of color, women, and/or LGBTQ people) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (all Plaintiffs); (3) race and/or gender discrimination in violation of Title VII (all Plaintiffs for a gender Subclass; Plaintiffs Gilliard and Smith for a race/ethnicity Subclass); (4) violations of the Civil Service Reform Act (CSRA), 5 U.S.C. § 7511 *et seq.*, by, *inter alia,* removing federal workers through the imposition of government-wide Reductions in Force ("RIFs") that were, as ordered and implemented, not lawful (Plaintiffs who appealed their RIFs to the MSPB, *i.e.*, Plaintiffs Fell, Gilliard, and Stainnak).

I.  **INTRODUCTION**

1.      The United States is a diverse nation, whose strength and democratic legitimacy depend on a federal workforce that serves all communities without discrimination or political

---

[1] Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 29, 2025).
[2] Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025).

coercion. To ensure that government workplaces and programs serve all Americans and are available and accessible to all Americans, the United States government has undertaken initiatives to advance fairness and to protect equal opportunity within and outside the federal government. Congress has enacted, and successive administrations have implemented, laws and policies aimed at safeguarding equal opportunity and eliminating discrimination and retaliation against those who serve the United States.

2.      Diversity, equity, inclusion, and accessibility ("DEIA" or "DEI") are terms used to describe efforts taken to advance the mandates of the civil rights laws and to ensure fairness. Initiatives advancing diversity, equity, inclusion, and accessibility help workplaces secure the most skilled employees by drawing from the whole range of our nation's talent, ensure resources are allocated to meet the unique needs of different communities, advance our intelligence gathering and national security, and enhance our diplomatic corps' ability to engage in international diplomacy.

3.      DEIA relates to but is distinct from Equal Employment Opportunity ("EEO") principles, which focus on enforcing anti-discrimination statutes like Title VII, among others.

4.      Plaintiffs were federal employees who were terminated from federal service because they served or were perceived to have served in DEIA roles at some point in their careers.

5.      As committed career civil servants, all Plaintiffs performed their jobs faithfully under both Republican and Democratic administrations.

6.      Labeling them as "DEI" workers, the current Administration dismissed and derogated the skills, performance, and commitment Plaintiffs brought to their work. For months leading up to the 2024 presidential election, President Trump made clear his disdain for "DEI," a term he used pejoratively but never defined, associating it with political ideologies he disfavored (*e.g.*, "Marxism" or "the Radical Left"), with his predecessor, President Joseph Biden, and/or with people of color from the Democratic party, such as Vice-President Kamala Harris. During his campaign, President Trump pledged to "eliminate all 'Diversity, Equity, and Inclusion'

programs across the entire federal government,"[3] thereby eradicating the "ideology" he imputed to President Biden's "Marxist executive order[s]" and "Marxist concept of 'equity.'"[4]

7.      Immediately upon taking office, President Trump made good on his threats. On January 20, 2025, he signed EO 14151, directing the Director of the Office of Management and Budget ("OMB"), the Attorney General, and the Director of the Office of Personnel Management ("OPM") to engage in sweeping, top-down efforts to eliminate *all* DEIA-related offices, programs, and positions from *all* federal agencies within sixty days. The EO provided no definition of DEIA. The next day, President Trump signed EO 14173, again attacking DEIA without defining it.

8.      In the days and weeks that followed, OPM took up the President's charge and, in three separate memos, issued directives to federal agencies government-wide to carry out the anti-DEI EOs. Among other things and in direct violation of regulations governing federal personnel practices, OPM directed agencies to execute RIFs of all "employees who work in a DEIA office"; it also ordered agencies to terminate "all DEI, DEIA, and 'environmental justice' offices and positions." Plaintiffs and the Class were subsequently subjected to unlawful RIFs, many after being placed on indeterminate administrative leave.

9.      President Trump's directives did not merely represent a change in presidential priorities—a normal occurrence when presidential administrations change. Rather, they were targeted actions intended to punish perceived political enemies, as well as to eliminate from the federal workforce women, people of color, and those, like Plaintiffs, who advocated for or were perceived as advocating for protected racial or gender groups.

10.     Defendants' campaign to punish perceived political enemies via the anti-DEI EOs and OPM's implementing directives violates the First Amendment of the United States

---

[3] Donald J. Trump (@realDonaldTrump), Truth Social (June 30, 2023, 11:01 PM), https://perma.cc/KL56-7U6S.

[4] Donald J. Trump, *Agenda47: Eradicating Joe Biden's Sinister 'Equity' Executive Order That Has Led to the Woke Takeover of the U.S. Government* (Mar. 2, 2023), https://perma.cc/3EUH-D7M7.

Constitution. Firing non-partisan federal workers for their perceived political beliefs—based upon their performing their job duties under the policies of the prior Administration—not only strips the federal government of skilled, competent professionals, but also tramples on those employees' constitutional and statutory rights.

11.     The anti-DEI EOs and implementing directives also violate Title VII in multiple ways. First, while neutral on their face, these policies had an unlawful disparate impact on women and non-binary employees, and/or people of color. Second, Defendants initiated these policies with the intent to discriminate against, or maintained them with the knowledge of their impact on, protected groups of: (i) women and non-binary workers, and/or people of color and/or (ii) workers who advocated or were perceived to have advocated for Americans who are members of protected gender or racial groups.

12.     The anti-DEI EOs and implementing directives also violate the CSRA. Separating federal workers from federal service through a government-wide RIF that targets employees rather than positions disregards the safeguards inherent in federal RIF regulations and violates merit system principles. Defendants deprived Plaintiffs and the Class of procedural and substantive protections including the right to be free from discrimination based on perceived political affiliation, the right to be free from discrimination based on race, and/or gender, and the right to be free of infringement of the protections of the First Amendment.

13.     Plaintiffs seek declaratory and injunctive relief, including reinstatement of federal employees terminated because of the anti-DEI EOs and implementing directives, where appropriate. Plaintiffs also seek back pay, lost benefits, compensatory damages, and all other equitable relief necessary to make affected employees whole, including expungement of references to termination from their records.

## II.     **JURISDICTION AND VENUE**

14.     Jurisdiction is proper under 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-16(c) (Title VII).

15.     This is a mixed case within the meaning of 5 U.S.C. § 7702 and Plaintiffs have administratively exhausted.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are United States agencies and officers acting in their official capacities, and a substantial part of the events giving rise to these claims occurred or were directed here.

17.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent equitable powers.

### III.     PARTIES

18.     Plaintiff Stephanie Fell is a white woman who has worked in Washington, D.C. After working for the federal government for 20 years, Fell was targeted for separation from federal service as a result of the anti-DEI EOs and implementing directives. At the time of the RIF through which she was removed, Fell was a Supervisory Program Analyst within the Department of Homeland Security ("DHS"), GS-0343-15, operating in the role of Deputy Director of the Antidiscrimination Group within DHS's Office of Civil Rights and Civil Liberties ("CRCL"). On June 20, 2025, Fell filed an appeal of her removal with the MSPB, asserting class claims (DC-0351-25-2879-I-1). As of October 18, 2025, Fell exhausted her claims before the MSPB pursuant to 5 U.S.C. § 7702(e)(1) and 29 C.F.R. § 1614.310. Fell brings this action individually and on behalf of all similarly situated federal employees.

19.     Plaintiff Stephanie Gilliard is a Black woman who has worked in Washington, D.C. After working for the federal government for 17 years, Gilliard was targeted for separation from federal service as a result of the anti-DEI EOs and implementing directives. At the time of her RIF, Gilliard was a Diversity, Equity, Inclusion and Accessibility Coordinator within the Department of Justice's Executive Office of Immigration Review, Office of Policy. On May 22, 2025, Gilliard filed an appeal of her removal pursuant to a RIF with the MSPB, asserting class claims (DC-0351-25-2666-I-1). As of September 19, 2025, Gilliard exhausted her claims before

the MSPB pursuant to 5 U.S.C. § 7702 and 29 C.F.R. § 1614.310. Gilliard brings this action individually and on behalf of all similarly situated federal employees.

20.     Plaintiff L.L. Smith is a Black woman who has worked in Bethesda, Maryland. After working for the federal government for approximately a year, Smith was targeted for separation as a result of the anti-DEI EOs and implementing directives. At the time of her RIF, Smith was a Program Specialist within the National Institutes of Health. Smith filed an initial claim of discrimination with her agency's EEO office on March 10, 2025. Her attempts to pursue the agency's administrative process for her complaint were rendered futile, as she received no response to her initial filing and subsequent follow-up attempt on August 1, 2025 until September 16, 2025, 190 days later, when she was told that she still did not have an investigator assigned and her agency had issued a "Stop Work Order" for all EEO counseling. On November 24, 2025, 259 days after she filed a specific and detailed initial complaint, the agency EEO office made contact to discuss "next steps." Smith had timely followed the Agency's procedures to file an initial complaint and had, long before, given the Agency notice of the substance of her complaint and an opportunity to correct its own errors. The Agency, however, has failed to make available timely EEO counseling and failed to act to create a record for judicial review. Requiring further delay for administrative review would prejudice Plaintiff Smith's court action. Therefore, pursuant to 29 C.F.R. § 1614.407(b), Smith has presumptively exhausted her discrimination claims because she notified the Agency of the claims within 45 days of them arising and it is now more than 180 days since she filed her initial EEO complaint. Smith has also exhausted the administrative process for First Amendment Claims by filing a complaint with the U.S. Office of Special Counsel pursuant to 5 U.S.C. § 1214(a)(1)(A). She brings her First Amendment and Title VII claims individually and on behalf of all similarly situated federal employees.

21.     Plaintiff Mahri Stainnak is a non-binary white individual who has worked in Washington, D.C. After working for the federal government for 16 years, Stainnak was targeted for separation from federal service as a result of the anti-DEI EOs and implementing directives.

Before their RIF, Stainnak was the Director of the Talent Innovation Group in OPM's Workforce, Policy, and Innovation Office, a position not within OPM's Office of DEIA. On March 26, 2025, Stainnak filed an appeal of their removal pursuant to a RIF with the MSPB, asserting class claims (PH-0351-25-1316-I-1). As of July 25, 2025, Stainnak exhausted claims before the MSPB pursuant to 29 C.F.R. § 1614.310. Stainnak brings this action individually and on behalf of all similarly situated federal employees.

22.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity for issuing the anti-DEI EOs and directing their enforcement. Plaintiffs seek only a declaratory judgment against Defendant Trump.

23.    Defendant OPM is the federal agency responsible for overseeing and implementing personnel policies across the federal workforce and directed the actions impacting all Class members. Under the anti-DEI EOs, Defendant Trump directed OPM to review and revise employment practices and ensure the termination of DEI-related positions, policies, and programs. OPM issued three directives instructing executive agencies on how to target employees for separation to implement the anti-DEI EOs.

24.    Defendant Scott Kupor, Director of OPM, is sued in his official capacity for directing the agency responsible for issuing and enforcing directives implementing the anti-DEI EOs, including directing federal agencies to close all DEI offices and terminate employees engaged in DEIA work going back to November 5, 2024.

25.    Defendant OMB is the federal agency responsible for enforcing executive directives regarding federal workforce restructuring and budgeting. Under the anti-DEI EOs, President Trump tasked OMB with overseeing agency compliance with the elimination of DEI-related expenditures, positions, and contracts.

26.    Defendant Russell Vought, Director of OMB, is sued in his official capacity for overseeing the implementation of the anti-DEI EOs across federal agencies, including directing agency heads to identify and eliminate DEIA-related programs, positions, and funding.

27.     Defendant Department of Health and Human Services ("HHS") is the federal agency responsible for the administration and oversight of public health and biomedical research, including the National Institutes of Health ("NIH"). Under the anti-DEI EOs, HHS, at the direction of Defendant Trump and pursuant to directives from OPM and OMB, directed NIH to restructure or eliminate DEIA offices, programs, and positions.

28.     Defendant Robert F. Kennedy Jr., Secretary of HHS, is sued in his official capacity for implementing and enforcing the anti-DEI EOs within HHS and NIH. Due to his direction, NIH placed employees on administrative leave, reassigned, or removed staff based on the elimination of DEIA-related functions pursuant to OPM and OMB directives.

29.     Defendant Department of Homeland Security ("DHS") is the federal agency responsible for national security, immigration enforcement, and related operations. Pursuant to the anti-DEI EOs and implementing directives from OPM and OMB, DHS eliminated or restructured its Office for Civil Rights and Civil Liberties and other DEIA-related offices, resulting in the removal, reassignment, or termination of affected employees.

30.     Defendant Kristi Noem, Secretary of the Department of Homeland Security, is sued in her official capacity for directing and overseeing DHS's implementation of the anti-DEI EOs, including mandates to close or repurpose DEIA offices and to terminate or reassign employees engaged in DEIA-related work.

31.     Defendant Department of Justice ("DOJ") is the federal agency charged with enforcing federal law and ensuring equal justice under law. Under the anti-DEI EOs, DOJ was required to review and eliminate its DEIA-related policies, training programs, and staffing.

32.     Defendant Pam Bondi, Attorney General of the United States, is sued in her official capacity for overseeing DOJ's implementation of the anti-DEI EOs, including directives to dismantle DEIA-related offices and to remove or reassign affected personnel.

33.     Defendant Department of Agriculture is a federal agency. Under the anti-DEI EOs, the Department of Agriculture was required to review and eliminate its DEIA-related policies, training programs, and staffing.

34.     Defendant Brooke Rollins, Secretary of Agriculture, is sued in her official capacity for overseeing the Department of Agriculture's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

35.     Defendant Central Intelligence Agency is a federal agency. Under the anti-DEI EOs, the Central Intelligence Agency was required to review and eliminate its DEIA-related policies, training programs, and staffing.

36.     Defendant John L. Ratcliffe, Director of Central Intelligence Agency, is sued in his official capacity for overseeing the Central Intelligence Agency's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

37.     Defendant Commodity Futures Trading Commission ("CFTC") is a federal agency. Under the anti-DEI Executive Orders and implementing directives, the CFTC was required to review and eliminate its DEIA-related policies, training programs, and staffing.

38.     Defendant Caroline D. Pham, Acting Chairman of the CFTC, is sued in her official capacity for overseeing the CFTC's implementation of the anti-DEI Executive Orders and related directives, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

39.     Defendant Department of Commerce is a federal agency. Under the anti-DEI EOs, the Department of Commerce was required to review and eliminate its DEIA-related policies, training programs, and staffing.

40.     Defendant Howard Lutnick, Secretary of Commerce, is sued in his official capacity for overseeing the Department of Commerce's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

41.     Defendant Department of Defense is a federal agency. Under the anti-DEI EOs, the Department of Defense was required to review and eliminate its DEIA-related policies, training programs, and staffing.

42.     Defendant Pete Hegseth, Secretary of Defense, is sued in his official capacity for overseeing the Department of Defense's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

43.     Defendant Department of Education is a federal agency. Under the anti-DEI EOs, the Department of Education was required to review and eliminate its DEIA-related policies, training programs, and staffing.

44.     Defendant Linda McMahon, Secretary of Education, is sued in her official capacity for overseeing the Department of Education's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

45.     Defendant Department of Energy is a federal agency. Under the anti-DEI EOs, the Department of Energy was required to review and eliminate its DEIA-related policies, training programs, and staffing.

46.     Defendant Chris Wright, Secretary of Energy, is sued in his official capacity for overseeing the Department of Energy's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

47.     Defendant Environmental Protection Agency is a federal agency. Under the anti-DEI EOs, the Environmental Protection Agency was required to review and eliminate its DEIA-related policies, training programs, and staffing.

48.     Defendant Lee Zeldin, Administrator of the Environmental Protection Agency, is sued in his official capacity for overseeing the Environmental Protection Agency's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

49.     Defendant Federal Aviation Administration is a federal agency. Under the anti-DEI EOs, the Federal Aviation Administration was required to review and eliminate its DEIA-related policies, training programs, and staffing.

50.     Defendant Bryan Bedford, Administrator of the Federal Aviation Administration, is sued in his official capacity for overseeing the Federal Aviation Administration's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

51.     Defendant Federal Reserve Board is a federal agency. Under the anti-DEI EOs, the Federal Reserve Board was required to review and eliminate its DEIA-related policies, training programs, and staffing.

52.     Defendant Jerome H. Powell, Chairman of the Federal Reserve Board, is sued in his official capacity for overseeing the Federal Reserve Board's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

53.     Defendant Federal Trade Commission is a federal agency. Under the anti-DEI EOs, the Federal Trade Commission was required to review and eliminate its DEIA-related policies, training programs, and staffing.

54.     Defendant Andrew N. Ferguson, Chairman of the Federal Trade Commission, is sued in his official capacity for overseeing the Federal Trade Commission's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

55.     Defendant Food and Drug Administration is a federal agency. Under the anti-DEI EOs, the Food and Drug Administration was required to review and eliminate its DEIA-related policies, training programs, and staffing.

56.     Defendant Martin A. Makary, Commissioner of the Food and Drug Administration, is sued in his official capacity for overseeing the Food and Drug

Administration's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

57. Defendant Department of Housing and Urban Development is a federal agency. Under the anti-DEI EOs, Housing and Urban Development was required to review and eliminate its DEIA-related policies, training programs, and staffing.

58. Defendant Scott Turner, Secretary of Housing and Urban Development, is sued in his official capacity for overseeing Housing and Urban Development's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

59. Defendant Department of the Interior is a federal agency. Under the anti-DEI EOs, the Department of the Interior was required to review and eliminate its DEIA-related policies, training programs, and staffing.

60. Defendant Doug Burgum, Secretary of the Interior, is sued in his official capacity for overseeing the Department of the Interior's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

61. Defendant Department of Labor is a federal agency. Under the anti-DEI EOs, the Department of Labor was required to review and eliminate its DEIA-related policies, training programs, and staffing.

62. Defendant Lori Chavez-DeRemer, Secretary of Labor, is sued in her official capacity for overseeing the Department of Labor's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

63. Defendant National Aeronautics and Space Administration is a federal agency. Under the anti-DEI EOs, the National Aeronautics and Space Administration was required to review and eliminate its DEIA-related policies, training programs, and staffing.

64.     Defendant Sean Duffy, Acting Administrator of the National Aeronautics and Space Administration, is sued in his official capacity for overseeing the National Aeronautics and Space Administration's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

65.     Defendant National Institutes of Health is a federal agency. Under the anti-DEI EOs, the National Institutes of Health was required to review and eliminate its DEIA-related policies, training programs, and staffing.

66.     Defendant Jay Bhattacharya, Director of the National Institutes of Health, is sued in his official capacity for overseeing National Institutes of Health's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

67.     Defendant Office of the Director of National Intelligence is a federal agency. Under the anti-DEI EOs, the Office of the Director of National Intelligence was required to review and eliminate its DEIA-related policies, training programs, and staffing.

68.     Defendant Tulsi Gabbard, Director of National Intelligence, is sued in her official capacity for overseeing the Department of National Intelligence's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

69.     Defendant Department of State is a federal agency. Under the anti-DEI EOs, the Department of State was required to review and eliminate its DEIA-related policies, training programs, and staffing.

70.     Defendant Marco Rubio, Secretary of State, is sued in his official capacity for overseeing Department of State's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

71.     Defendant Department of Transportation is a federal agency. Under the anti-DEI EOs, the Department of Transportation was required to review and eliminate its DEIA-related policies, training programs, and staffing.

72.     Defendant Sean Duffy, Secretary of Transportation, is sued in his official capacity for overseeing the Department of Transportation's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

73.     Defendant Department of the Treasury is a federal agency. Under the anti-DEI EOs, the Department of the Treasury was required to review and eliminate its DEIA-related policies, training programs, and staffing.

74.     Defendant Scott Bessent, Secretary of the Treasury, is sued in his official capacity for overseeing the Department of the Treasury's implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

75.     Defendant Department of Veterans Affairs is a federal agency. Under the anti-DEI EOs, the Department of Veterans Affairs was required to review and eliminate its DEIA-related policies, training programs, and staffing.

76.     Defendant Douglas A. Collins, Secretary of Veterans Affairs, is sued in his official capacity for overseeing Veterans Affairs' implementation of the anti-DEI EOs, including directives to dismantle or rebrand DEIA-related offices and to remove or reassign affected personnel.

## IV.     BACKGROUND

### A.     Diversity, Equity, Inclusion, and Accessibility Initiatives and Anti-Discrimination Laws Have Deep Roots in the Federal Government

77.     Laws and policies advancing workplace fairness and combatting workplace discrimination extend back over 100 years to at least 1883, with the passage of the Pendleton Act that focused on merit rather than connections for federal work. With the desegregation of the armed forces in the 1940s and passage of civil rights laws in the 1960s, the federal government adopted more concerted efforts to advance diversity, enhance fairness, and ensure meritocratic outcomes.

78.     Enacted as part of the Civil Rights Act of 1964, Title VII prohibits employment discrimination based on race, color, religion, sex, and national origin. Congress designed this landmark legislation to eliminate pervasive discrimination in the workplace and to promote equal employment opportunities for all individuals.

79.     On the heels of Title VII's enactment, President Lyndon B. Johnson in 1965 issued Executive Order 11246, prohibiting employment discrimination based on race, color, religion, and national origin by federal contractors and subcontractors.

80.     In 1972, Congress passed the Equal Employment Opportunity Act of 1972, which extended to federal employees the protections of Title VII.

81.     In 1978, Congress passed the CSRA, which reinforced merit system principles mandating, inter alia, "fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights."[5]

82.     In 2011, President Barack Obama issued Executive Order 13583, directing federal agencies to implement a comprehensive, government-wide strategy to promote diversity and inclusion in the federal workforce. Recognizing the federal government's role as the nation's largest employer, the order sought to remove barriers to equal employment opportunity while ensuring merit-based hiring and advancement.[6]

83.     To extend these efforts, on January 20, 2021, President Biden signed Executive Order 13985 ("EO 13985"), *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, which sought to ensure diversity, equity, inclusion, and accessibility throughout the federal government.[7] The order explained, "Equal opportunity is the bedrock of American democracy, and our diversity is one of our country's greatest strengths. But

---

[5] 5 U.S.C. § 2301(b)(2). The CSRA also mandates protection for federal employees "against arbitrary action, personal favoritism, or coercion for partisan political purposes." *Id.* at (8)(A).
[6] Exec. Order No. 13,583, 76 Fed. Reg. 52847 (Aug. 18, 2011).
[7] Exec. Order No. 13,985, 86 Fed. Reg. 7009 (Jan. 25, 2021).

for too many, the American Dream remains out of reach." Accordingly, the order declared that it was the Administration's policy to "pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." In pursuit of that policy, the Administration set up a plan, coordinated by the White House Domestic Policy Counsel, "to embed equity principles, policies, and approaches across the Federal Government." The EO ordered action items, policy initiatives, assessments, and working groups to achieve that plan.

84.     A few months later, on June 25, 2021, President Biden issued Executive Order 14035, reaffirming the federal government's commitment to fostering a workforce that reflects the diversity of the American people.[8]  The Order directed agencies to develop strategic plans to, *inter alia*, eliminate barriers to equal opportunity and ensure equitable access to employment, promotion, and professional development. It also emphasized the importance of accessibility for individuals with disabilities, pay fairness, and the recruitment and retention of qualified workers from underrepresented groups.

85.     These statutes and executive directives demonstrate how the federal government's commitment to equal opportunity has evolved over time consistent with Title VII, the CSRA, and other federal laws.

**B.     Congress Provided Federal Employees With Robust Rights Under the CSRA**

86.     In 1978, Congress enacted the CSRA, Pub. L. No. 95-454, 92 Stat. 1111 (1978). The Act declared that, "[i]t is the policy of the United States that -- in order to provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity, and to improve the quality of public service, Federal personnel management should be implemented consistent with merit system principles and free from prohibited personnel practices."[9] In doing so, Congress sought to synthesize, expand upon, and

---

[8] Exec. Order No. 14,035, 86 Fed. Reg. 34593 (June 30, 2021).
[9] Civil Service Reform Act of 1978, Findings and Statement of Purpose, available at 5 U.S.C. § 1101 notes, Sec. 3(1).

further codify the patchwork of processes that had developed over almost a century to ensure that government employment decisions are based on merit, not political or personal favoritism.

87.    The CSRA's merit system principles guarantee that "all employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights."[10] The Act also specifically protects federal employees against "arbitrary action, personal favoritism, or coercion for partisan political purposes."[11] These protections reflect Congress' commitment to maintaining a politically neutral and professional civil service that serves the public interest instead of partisan agendas.

88.    To enforce these principles, the CSRA prohibits supervisors and managers who are taking personnel actions from committing any of the prohibited personnel practices specifically enumerated at 5 U.S.C. § 2302(b), including:  discrimination in violation of the Civil Rights Act of 1964 on the basis of race, color, religion, sex, or national origin (5 U.S.C. § 2302(b)(1)(A));  discrimination on the basis of political affiliation or political coercion (*id.* at (b), (1E) & (3)); and taking or failing to take any other personnel action if such action "violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title" (*id*. at (b)(12)). These prohibitions protect career employees from being punished or removed for political or discriminatory reasons. The violations alleged in this case strike directly at these statutory protections.

89.    The CSRA has detailed provisions governing RIFs, the mechanism Defendants claim to have used to remove Plaintiffs. Even here, Congress urged restraint, warning that separating employees through a RIF should be avoided wherever possible to prevent the "loss to the Government of the knowledge and experience that these employees possess."[12]

---

[10] 5 U.S.C. § 2301(b)(2).
[11] 5 U.S.C. § 2301(b)(8)(A).
[12] Civil Service Reform Act of 1978, Findings and Statement of Purpose, available at 5 U.S.C. § 1101 notes, Sec. 3 (9).

90.     When RIFs are unavoidable, the CSRA requires that they be carried out in accordance with regulations prescribed by OPM ensuring that tenure of employment, military preference, length of service, and efficiency or performance ratings be the basis for retention.[13] These requirements are designed to ensure that agencies conducting RIFs prioritize expertise and target positions, not individuals, and that agencies are prevented from manipulating this process for political or other unlawful reasons to purge disfavored employees.

91.     OPM's implementing regulations for agencies' implementation of RIFs are codified in 5 C.F.R. Part 351. They govern every aspect of a lawful RIF, from defining competitive areas and levels (5 C.F.R. § 351.402-403), to determining retention standing and accounting for veteran's preference (5 C.F.R. Part 351, Subpart E), to providing mandatory assignment and notice rights (5 C.F.R. §§ 351.701, 351.801).

92.     To assist agencies in complying with these strict requirements, OPM issued the Workforce Reshaping Operations Handbook.[14] Consistent with the CSRA, the Handbook advises that involuntary separation of employees in a RIF should be a last resort. Agencies must first consider alternatives, such as detailing employees to other agencies, reassigning surplus employees to other positions, training employees for other positions, and/or allowing permanent employees to retire early if their agency is undergoing a RIF.[15]

93.     As a fundamental principle, the Handbook warns that, "No position may be abolished based on the individual occupying the position." Instead, "Agency management must abolish positions based on the mission and/or budget."[16]

---

[13] 5 U.S.C. § 3502(a).
[14] Off. of Pers. Mgmt., *Workforce Reshaping Operations Handbook, A Guide for Agency Management and Human Resources Offices*, at 3 (Mar. 2017), https://perma.cc/N53C-A4BS ("Handbook"); *see* 5 C.F.R. Part 351.205.
[15] *Id.* at 6-10; *see also* Management's Decision to Implement RIF Checklist, *id*. Appendix B at 7-12 (including multiple ways to reduce the impact of involuntary separations) (available at https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping_appx.pdf).
[16] *Id.* Appendix B at 7.

94.    To safeguard against targeting individuals, OPM's regulations on RIFs mandate that agencies identify and disclose competitive areas and levels. A competitive area is the part of the agency within which employees are compared to each other during a RIF. Agencies must ensure that all employees performing similar work in this area are treated fairly and transparently.[17]

95.    Within each competitive area, agencies must establish competitive levels, placing in the same pool all employees in the same grade and occupational series who could reasonably perform each other's jobs.[18]

96.    Competitive levels exist so that the government retains the most qualified, longest-serving, and best performing employees when a RIF occurs. To determine who is retained and who is separated, the agency must calculate a retention standing for each employee based on objective factors like tenure, veteran preference, length of service, and performance.[19] Employees with lower retention scores are RIF'd while higher ranked employees have rights to stay or compete for reassignment into other positions for which they qualify (5 C.F.R. §§ 351.601, 351.701) subject to certain exceptions (5 C.F.R. § 351.607- 08). These procedures serve as essential guardrails to ensure that RIFs are driven by legitimate mission needs, not by animus or politics.

C.    **The Trump Administration Associates DEIA with Political Enemies and Seeks to Purge the Government of Those Enemies**

97.    Even before he began his second term, President Trump repeatedly characterized diversity, equity, and inclusion as an "un-American" "leftist" "woke" ideology perpetrated by President Biden and other political opponents and pledged to purge the federal workforce of anyone associated with it.

98.    During his presidential campaign, Donald Trump explicitly tied DEI measures to Marxists, the "Radical Left," the Democratic Party, and his opponent, President Biden. In a

---

[17] 5 C.F.R. § 351.402(c).
[18] 5 C.F.R. § 351.403(a)(1).
[19] 5 C.F.R. § 351.501(a).

March 2, 2023 speech, Trump stated that "Joe Biden recently signed a very sinister executive order mandating that almost every federal department and agency establish a Marxist 'equity'—this is something new—enforcement squad to implement a woke takeover of the entire federal government."[20] Trump further asserted that "[e]very institution in America is under attack from this Marxist concept of 'equity[]' . . . a catch-all term used by the Radical Left to justify every one of its crazy programs."  He argued that by signing the executive order, "Biden [was] weaponizing every tool of government power to push this racism and this Communism and Marxism, or whatever you want to call it."  Trump then vowed to "immediately terminate all staffers, . . . offices[,] and initiatives connected to [Biden's DEI policies],"[21] and promised to "get this extremism out of the White House, out of the military, out of the Justice Department, and out of our government."

99.     Two days later, at the Conservative Political Action Conference, he reiterated his previous statements, promising to remove "Joe Biden's crazy executive order installing Marxist diversity, equity, and inclusion czars in every federal agency," and vowed to terminate staffers hired to implement the perceived Marxist policies.[22]

100.    A few months later, candidate Trump stated that he would overhaul the college accreditation system and, as part of the new accreditation standards, he would require colleges to "remov[e] all Marxist diversity, equity and inclusion bureaucrats."[23]

---

[20] Donald J. Trump, *Agenda47: Reversing Biden's EO Embedding Marxism in the Federal Government* (Mar. 2, 2023), https://perma.cc/3MP4-296G.

[21] *Id.*; *see also* Donald J. Trump, *Agenda47: Eradicating Joe Biden's Sinister 'Equity' Executive Order That Has Led to the Woke Takeover of the U.S. Government* (Mar. 2, 2023), https://perma.cc/3EUH-D7M7.

[22] *Former President Trump Speaks at CPAC*, C-SPAN, at 1:25:53-1:26:11 (Mar. 4, 2023), https://www.c-span.org/program/campaign-2024/former-president-trump-speaks-at-cpac/624800 ("On day one, I will revoke Joe Biden's crazy executive order installing Marxist diversity, equity, and inclusion czars in every federal agency, and I will immediately terminate all staffers hired to implement this horrible agenda.").

[23] Donald J. Trump, *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions*, at 1:15-1:20 (July 17, 2023), https://perma.cc/A6KT-ZG3G.

101.     Throughout the 2024 presidential election campaign, individuals and organizations closely aligned with Trump amplified these attacks. For instance, on January 10, 2024, Pete Hegseth, then-cohost of the "Fox & Friends Weekend" show (now Secretary of Defense), stated, "The basis of DEI . . . is a Marxist philosophy based on breaking down America."[24] The Heritage Foundation—which, under the guidance of Defendant Russell Vought, created the Project 2025 government blueprint that President Trump has endorsed[25]—described DEI as a "managerialist left-wing race and gender ideology" and urged Trump to "eliminate every one of these wrongful and burdensome ideological projects."[26] Indeed, the Heritage Foundation went so far as to say that Trump should "[t]reat the participation in any critical race theory or DEI initiative, without objecting on constitutional or moral grounds, as *per se* grounds for termination of employment."[27]

102.     President Trump continued these attacks after the 2024 election. On December 22, 2024, he stated publicly that he would "end all of the *Marxist* diversity, equity, and inclusion policies across the entire federal government immediately." (emphasis added).[28]

103.     Members of President Trump's inner circle and incoming senior officials echoed and reinforced a plan to purge career federal workers based on perceived political beliefs.[29]

---

[24] *DEI is a 'Marxist philosophy based on breaking down America': Pete Hegseth*, Fox Business, at 0:50-0:56 (Jan. 10, 2024),  https://www.foxbusiness.com/video/6344637508112.

[25] Jill Colvin, *See Amid Shutdown Fight, Trump No Longer Distancing Himself from Project 2025*, PBS News, Oct. 3, 2025, https://perma.cc/TD27-FXPD.

[26] Naftali Bendavid & Cleve R. Wootson Jr., *Trump's fierce attacks on DEI reflect a longtime GOP focus*, The Washington Post (Feb. 1, 2025), https://perma.cc/W49S-WDR9.

[27] Melissa Quinn & Jacob Rosen, *What is Project 2025? What to know about the conservative blueprint for a second Trump administration*, CBS News, (Nov. 8, 2024), https://perma.cc/3NKN-JB5S; *see also* Mike Gonzalez, *The Battle Over DEI is Far From Over*, Heritage Found. (June 27, 2024), https://perma.cc/HG28-J2UW ("DEI is just one front in the fight against ideologies that divide us mostly along racial and sexual lines, based on race and gender theories that are Marxist in their origin.").

[28] Donald J. Trump, *Speech: Donald Trump Addresses a Turning Point USA Political Rally in Phoenix – December 22, 2024,* Roll Call (Dec. 22, 2024), https://perma.cc/7CWA-W8RJ (emphasis added).

[29] *See, e.g.,* Hanna Rosin, *What Pete Hegseth's Nomination Is Really About,* The Atlantic (Nov. 21, 2024), https://perma.cc/ZZ6E-KJQC (discussing statements by Pete Hegseth, nominee for

104.    For example, President Trump's staff made statements reflecting that they were trying to fire employees whose political beliefs might not sufficiently align with the Administration and freeze hiring to ensure that agencies would not be able to replace the terminated employees with employees whose beliefs were not politically aligned with the Administration. They also made statements suggesting that the Administration would use the hiring freeze period to vet individuals to ensure their beliefs were politically aligned with the Administration, then hire those who survived the ideological vetting to replace the previously fired employees.

a.    On January 6, 2025, then-Representative and incoming-National Security Advisor Mike Waltz tweeted that "anyone working under President Trump in the NSC will be fully aligned with his America First agenda. Any rumors or suggestions to the contrary are fake news and a distraction from the mission. We will clear the decks to Make America Great Again!"[30]

b.    When discussing the Administration's hiring plans during an interview on January 23, White House Personnel Director Sergio Gor stated that "you have to clean house."[31] He explained that, with the help of the Department of Government Efficiency ("DOGE"), the Administration "started the process of terminating a lot of positions" and was "cleaning house and boards and commissions in the government." Gor explained that these efforts to clean house were then paired with a "hiring freeze" which would "enable [the Administration] to vet new people coming in."

c.    When confronted with concerns about new hiring practices, including that the Administration was requiring political loyalty tests and that many federal employees were

---

Secretary of Defense, alleging that "woke" and DEI initiatives in government and the military are rooted in Marxist ideology).
[30] Ambassador Mike Waltz (@michaelgwaltz), X (Jan. 6, 2025, 9:23 am), https://perma.cc/W2HB-5K7J.
[31] America Reports, Interview of Sergio Gor, Fox News at 4:40-4:42 (Jan. 23, 2025), https://www.foxnews.com/video/6367584403112.

afraid that they would be fired because their political beliefs differed from President Trump's, White House communications director Steven Cheung defended the policy, stating: "'No one should be surprised that those being hired should align with the mission of the Administration,' and 'Nobody in private industry would ever hire someone who isn't mission focused, and the government should be no different.'"[32]

105.    Several Cabinet members also made statements indicating that they had been trying to fire government employees based on their political beliefs. For example, on March 3, 2025, Attorney General Pam Bondi stated during an interview that she was "trying to find . . . Department of Justice [employees] who despise[] Donald Trump." She further explained that she was going to "root them out . . . and [that] they w[ould] no longer be employed."[33] A few months later, DHS Secretary Kristi Noem confirmed the campaign against DHS employees who "don't like [the Administration]."[34]

106.    Having identified DEIA initiatives as, *inter alia*, "Marxist" and "left-wing," and having committed to purging the government of career civil servants seen as political adversaries, the Administration moved to identify and remove federal employees associated or perceived to be associated with those initiatives.

**D.    The Trump Administration's Unlawful DEI Purge**

**1.    The Trump Administration Executes the Anti-DEI EOs**

107.    Upon returning to office in 2025, President Trump revived and expanded his campaign against DEI. On January 20, 2025, President Trump issued EO 14151, which accused the Biden Administration of "forc[ing] illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI) into virtually all aspects of the Federal

---

[32] Emily Hogkin & Falyn Stempler, *Donald Trump Leaves Civil Servants "Terrified" as MAGA Loyalty Tests Demand to Hear Testimonies*, Irish Star (Jan. 26, 2025), https://perma.cc/BX3N-E88P.
[33] Fox News, *AG Pam Bondi Vows to Rid DOJ of 'Worst of the Worst'*, YouTube, at 6:49-7:09 (Mar. 4, 2025), https://perma.cc/DX3F-MGPF.
[34] Philip Wang, *Kristi Noem Seeks Advice on Ousting DHS Employees Who "Don't Like Us"*, Axios (July 2, 2025), https://perma.cc/99PU-WC5N.

Government, in areas ranging from airline safety to the military."[35] Although both anti-DEI EOs describe DEI programs as "illegal and immoral discrimination programs" (EO 14151, Sec. 1) or "dangerous, demeaning, and immoral race- and sex-based preferences" (EO 14173, Sec. 1), these EOs nowhere define what constitutes DEI or how the disfavored programs are to be identified.

108.    Nevertheless, in addition to revoking Biden-era DEI efforts, President Trump's EO 14151 directed "[e]ach agency, department or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM," to, within sixty days:

a.    terminate all DEIA-related offices, programs, and positions as well as all diversity-focused hiring initiatives, training programs, and equity policies;

b.    provide the Director of OMB with a list of "all" DEIA-related positions, programs, committees, services, activities, and expenditures "in existence on November 4, 2024"—before the presidential election—and an assessment of whether they were "misleadingly relabeled" to evade elimination under the Order; and

c.    assess the cost and impact of "the prior administration's" DEI-related programs and policies.

109.    On January 21, 2025, President Trump signed EO 14173, revoking several executive orders advancing civil rights and ensuring fairness for Black Americans dating as far back as 1965. The EO distinguished between DEIA on the one hand, and anti-discrimination statutes on the other, positing that DEIA is inconsistent with the enforcement of anti-discrimination laws.

110.    Under the anti-DEI EOs, agencies were required to submit compliance plans detailing how they would identify, defund, and eliminate DEI workers and positions.

111.    President Trump tasked OPM with reviewing and revising employment policies to align with the anti-DEI EOs, issuing directives for federal agencies to close DEI offices, and

---

[35] *See* Associated Press, *Trump Attacks FAA's DEI Initiatives During Press Conference on Plane Crash*, YouTube (Jan. 30, 2025), https://perma.cc/V2JE-66DD (attributing airline safety failures to President Biden's alleged prior DEIA-focused recruitment efforts).

eliminating roles dedicated to DEI compliance. OMB was responsible for identifying DEI-related expenditures, ensuring agencies adhered to the EOs' mandates, and facilitating the termination of DEI personnel.

112.    In Executive Order 14210 ("EO 14210"), *Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative*,[36] President Trump reaffirmed his commitment to ridding the government of DEI, underscoring the elimination of "all agency diversity, equity, and inclusion initiatives" as a top priority for large-scale RIFs.

### 2.    OPM Issues Directives Implementing the Unlawful DEI Purge Government-Wide

113.    President Trump directed that the anti-DEI EOs be enforced immediately. OPM responded by issuing sweeping, governmentwide directives requiring agencies to identify and purge federal employees, such as Plaintiffs, who were perceived to have engaged in DEI-related work.

114.    On January 21, 2025, OPM's then-Acting Director Ezell issued initial directions to the "Heads and Acting Heads of Departments and Agencies," on how to implement EO 14151.[37] The initial directive required agencies, including all Defendants, to place "all employees of DEIA offices" on administrative leave effective immediately. OPM defined DEIA offices to include "the offices and agency sub-units focusing exclusively on DEIA initiatives and programs[.]"[38] OPM provided template emails for agency heads to use to accomplish these directives.

115.    The directive further required each agency to provide to OPM "a complete list of DEIA offices and any employees who [sic] in those offices **as of November 5, 2024**"; "a list of all contract descriptions or personnel position descriptions that were changed since November 5, 2024 to obscure their connection to DEIA programs"; and a "written plan for executing a

---

[36] Exec. Order No. 14,210, 90 Fed. Reg. 9669, 9670 (Feb. 14, 2025).
[37] Memorandum from Charles Ezell, Acting Dir. of OPM, to the Heads and Acting Heads of Dep'ts and Agencies, *Initial Guidance Regarding DEIA Executive Orders* (Jan. 21, 2025), https://perma.cc/4LAP-9KW6.
[38] *Id.*

reduction-in-force [RIF] action regarding the employees who work in a DEIA office."[39] With respect to their RIF plans, agencies were explicitly advised to "coordinate with OPM" in preparing them.

116.    On January 24, 2025, OPM issued further instructions to all federal agencies regarding the implementation of EO 14151.[40] These instructions directed agencies to terminate all DEI, DEIA, and environmental justice offices and positions within sixty days. This directive also clarified that, despite the initial deadline provided in OPM's January 21, 2025 initial guidance for agencies to submit written plans to OPM for reductions-in-force, "**agencies can and should be issuing RIF notices to employees of DEIA offices now**" and should "define the competitive area solely in terms of the DEIA office where the employees worked."

117.    On February 5, 2025, OPM issued additional directives to all federal agencies, *Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives*,[41] again requiring federal agencies, including all Defendants, to "eliminate all DEIA offices, policies, programs, and practices."

118.    Absent from OPM's directives was any discussion of—or even reference to—the rights that civil servants are guaranteed under the CSRA and 5 C.F.R. Part 351, which prescribe a comprehensive set of procedural protections in any lawful RIF. Regulations impose on the agency specific requirements for equitable treatment of federal employees during the RIF process that ensure that each employee's tenure, veterans preference, length of service and performance is the basis of decisions to retain or separate the employee. A federal employee's rights are violated if the government uses the RIF to target employees rather than targeting positions.

---

[39] *Id.*
[40] Memorandum from Charles Ezell, Acting Dir. of OPM, to the Heads and Acting Heads of Dep'ts and Agencies, *Guidance Regarding RIFs of DEIA Offices* (Jan. 24, 2025), https://perma.cc/Y589-AKKW.
[41] Memorandum from Charles Ezell, Acting Dir. of OPM, to the Heads and Acting Heads of Dep'ts and Agencies, *Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives* (Feb. 5, 2025), https://perma.cc/Q3PC-LCG9.

119.    Defendants' systematic and lightning quick government-wide rollout of the anti-DEI EOs and OPM's implementing directives was not merely a change in policy priorities—it was a purge of workers perceived as disloyal for their association with programs and ideas the new Administration disfavored. Rather than targeting job positions for elimination, OPM directed agencies to prepare RIFs to target specific people working in DEI roles as well as people who had previously held DEI roles but were now engaged in other work. It did so by requiring the creation of lists of employees associated with DEI going back to November 5, 2024, the date of the presidential election, and requiring that agencies purge those employees regardless of their current roles or duties. In the case of Plaintiff Stainnak, for example, OPM went so far as to cancel their job reassignment, returning them to a DEIA position simply to eliminate them via a DEIA-specific RIF.

120.    According to documents published by *The Washington Post*, the targeted elimination of DEI *workers* was a DOGE priority that OPM implemented, with each "phase" specifically defined and centrally coordinated.[42]

121.    "Phase 1" included President Trump's first days in office, when he signed the anti-DEI EOs and OPM directed all federal agencies to begin placing DEI workers on administrative leave. According to the *Post*, OPM's administrative leave notice template was "nearly identical" to the template DOGE created earlier in January.

122.    "Phase 2" governed the next month, where the focus shifted to identifying "corrupted branches" within government agencies—those, including statutorily mandated equal opportunity and civil rights offices, containing DEI divisions or with elements perceived to be tied to DEI initiatives—and non-DEI employees across the government who, *the Post* concluded, were "somehow doing DEI-related work." According to a spreadsheet published by *the Post*, DOGE planned to cut at least 583 employees at the end of this phase.

---

[42] Leslie Shapiro, et al., *See Inside DOGE's Playbook for Eliminating DEI*, Wash. Post (Feb. 15, 2025), https://perma.cc/FYH9-Z9LG.

123.    "Phase 3" set forth the final steps: identify and place on administrative leave additional employees perceived to have some connection to DEI but not housed in an explicitly DEI-based division; RIF the explicitly DEI offices "in their entirety," and RIF the "Phase 2 offices' corrupted branches."

**E.    Defendants Illegally Manipulated RIF Procedures to Accomplish Their DEI Purge**

124.    To rid the government of targeted workers, Defendants initiated illegal RIFs that failed to follow mandatory RIF procedures set forth under the CSRA, in regulations and in OPM's Handbook.

125.    These authorities make clear that a RIF is a last resort; agencies must make every effort to retain federal workers. To do so, agencies are advised to reassign them to other positions, even positions in other agencies, or retrain workers for needed positions, rather than allow workers to be separated from federal service.[43]

126.    By contrast, the Administration affirmatively sought to fire DEIA-associated individuals, even if those workers had previously moved on to other federal roles. Whereas a lawful RIF targets positions, not individual employees, Defendants unlawfully targeted individual employees for elimination by abusing the RIF process and ignoring the procedural safeguards attached to it. Federal employees who had transferred from, or were reassigned from, positions performing DEI work to other positions before January 20, 2025, found their transfers or reassignments cancelled. Some were involuntarily returned to their previous positions in DEI offices, only so that they could be separated through a RIF.

127.    Agencies manipulated RIF procedures and regulations in various ways to ensure the removal of targeted workers. On OPM's orders, agencies issued RIF notices without any of the preparation OPM's own Handbook requires.[44] OPM also dictated that agencies establish the

---

[43] *See* Civil Service Reform Act of 1978, Findings and Statement of Purpose, available at 5 U.S.C. § 1101 notes, Sec. 3 (9); *see, e.g.*, 5 C.F.R. § 351.302(a); Handbook, pp. 6-12 and Handbook Appendices at pp. 8-12 (Appendix B).

[44] Handbook, pp. 13-19 and Appendices to the Handbook, Appendix D, pp. 16-24; OPM Guidance dated January 21, 2025.

competitive area for DEIA RIFs to ensure targeted workers would be prevented from exercising their rights, under RIF regulations, to compete for retained positions (violating 5 C.F.R. § 351.402).[45] Alternatively, agencies set competitive levels so narrowly that workers were denied the right to compete for retention (violating 5 C.F.R. § 351.403(a)(1)). Finally, agencies denied these federal workers their right to be considered for reassignment as required by 5 C.F.R. § 351.701.

128.    Even as Defendants denied employees assignment rights that could have enabled them to retain their federal employment, they also took steps to ensure that employees who received notice of separation in a DEIA RIF would find it challenging to find reemployment in the federal government. For instance, Defendants denied DEI employees career transition assistance made available to others following their removals by locking them out of government data systems containing critical information necessary to apply to federal job opportunities.

### F.    The DEI Purge Had Its Intended and Actual Discriminatory Effects on Targeted Groups

129.    In fulfilling their promise to purge the federal government of DEI, Defendants went far beyond ridding the government of DEI roles and initiatives. Instead, they targeted individual employees for termination on the basis of (1) their perceived political beliefs or affiliation with former President Biden and the Democratic Party; (2) their actual or perceived race, gender, or gender identity; and (3) their actual or perceived advocacy for protected racial or gender groups (*i.e.*, people of color, women, and/or LGBTQ people).

130.    The results were sweeping. Pursuant to the anti-DEI EOs and their implementing directives, scores of federal employees were removed from the federal government on these unlawful bases.

#### a.    The DEI Purge Targeted Perceived Political Enemies

---

[45] OPM *DEIA Memorandum* dated January 24, 2025, p.1 ("Agencies are reminded to define the competitive area solely in terms of the DEIA office where the employees worked.").

131.    Defendants' explicit linkage of the November 5, 2024 presidential election with the terminations makes clear that Defendants used RIFs as a pretext to remove federal workers because of their perceived partisan political affiliation or beliefs.

132.    The Administration's goal was to target employees based on their perceived political beliefs; numerous individuals were subject to RIFs due to the anti-DEI EOs and implementing directives, even though those workers were not, or were no longer, in positions specifically labeled as DEI-related or performing work that was DEI-related. Indeed, some terminated employees were even performing work that was statutorily mandated.

133.    Plaintiff Stainnak's experience is illustrative. By the time President Trump signed the anti-DEI EOs, Stainnak had already been reassigned from the DEI office and begun working in a new, non-DEI position. After the anti-DEI EOs, however, Stainnak's reassignment was canceled, and they were involuntarily re-reassigned to the defunct DEI-related position they had previously occupied just so Defendants could separate them in an anti-DEI RIF—indeed, Stainnak's "reassignment" back to ODEIA occurred on the very day Stainnak received a RIF notice citing the anti-DEI EOs as the reason for the adverse action.

134.    Likewise, departures from well-established RIF practices and federal regulations—even for employees who, like Plaintiff Gilliard, were in DEI positions at the time of their RIFs—confirm that the Administration targeted Plaintiffs and class members via the anti-DEI EOs and OPM directives because the Administration deemed them political enemies. Defendants targeted Plaintiffs for inferior treatment by denying them their rights to compete for retained positions or be reassigned within the competitive area to which they were entitled under the law. These departures from regulatory requirements were designed to prevent employees deemed to be politically undesirable from obtaining other work inside the government.

135.    The absence of a legitimate explanation either for the terminations of employees who no longer served in roles defined as DEI by the Anti-DEI EOs, or for the departure from legally required RIF procedures for such employees as well as for employees who held DEI

positions at the time of their RIFs, underscores that Defendants took these actions to retaliate against Plaintiffs and Class members for their perceived political beliefs.

   **2.**  **The DEI Purge Had the Intent and Effect of Removing Workers from Protected Racial and Gender Groups.**

  136. The anti-DEI EOs and related directives also had the intended and actual effect of disproportionately harming women and people of color. RIFs due to the anti-DEI EOs and implementing directives reveal that the people targeted for termination included substantially more women and/or non-binary workers, and an over-selection of people of color, with a substantial over-selection of Black employees.

  137. For example, at DHS, at least 97 female and 37 male employees were RIF'd from a civil rights office characterized by DOGE as "corrupted" by DEI. When compared to the number of women in the federal workforce (approximately 918,127) vs. men in the federal workforce (approximately 1,122,155),[46] or even compared within DHS (69,019 vs.130,616),[47] the adverse impact is stark and disproportionate. The impact on employees of color is similarly evident. For example, 41 Black employees and 71 white employees were RIF'd from that same unit: when compared to the number of Black (approximately 383,573) and white (approximately 1,213,968) employees in federal service or just within DHS in full (33,365 vs. 103,298), there is a disparate impact.[48] Five people now remain in CRCL at DHS: all are men, and four are white.

  138. Publicly available sources confirm the demographic skew. The American Accountability Foundation, a conservative watchdog group backed by Project 2025's Heritage Foundation, published a public "DEI watchlist" of senior civil servants to be targeted.[49] At the

---

[46] A Profile of the 2023 Federal Workforce, Partnership for Public Service, https://perma.cc/Z6YG-RRL6.
[47] DHS Demographics & Statistics, EEO Mgmt. Section, DHS, https://perma.cc/Y5U5-SK9N.
[48] DHS Demographics & Statistics, EEO Mgmt. Section, DHS, https://perma.cc/Y5U5-SK9N.
[49] Melissa Hellmann, *'Really Scary': Rightwing Watchlist Found of Mostly Black Federal Health Workers*, The Guardian (Feb. 6, 2025) https://perma.cc/FF7S-3G28.

time of the filing of this complaint, there are 96 people listed on the DEI watchlist: 92 present as women and/or people of color; 4 appear to be white men.[50]

139.    As a result of the Administration's discriminatory patterns and practices, women and people of color have been systematically harmed. As *The New York Times* reported, the Trump Administration has targeted for the largest work force reductions or complete elimination of agencies where people of color and women were a majority of the work force, such as the Department of Education and the U.S. Agency for International Development.[51]

140.    Plaintiffs were also targeted due to their protected race and/or gender status, including being subject to RIF while similarly-situated employees outside their protected class were not.

141.    Likewise, departures from long-established RIF practices and federal regulations confirm that the Administration targeted Plaintiffs and class members for removal by the anti-DEI EOs and OPM directives because of their protected race and/or gender status.

142.    These departures from regulatory requirements were designed to prevent employees with protected race and/or gender status from obtaining other work inside the government.

### 3.    The DEI Purge Removed Employees Perceived as Advocating for Protected Gender and Racial Groups

143.    Through the anti-DEI EOs and implementing directives, the Administration targeted workers perceived as advancing civil rights, equal opportunity, or government programs serving protected gender and racial groups.

144.    Defendants targeted not only employees in DEI-labeled roles, but anyone perceived as advocating for protected racial or gender groups, even where such work was legally

---

[50] *DEI Watchlist: America's Bureaucrats Most Abusing Diversity, Equity and Inclusion*, Am. Accountability Found., https://perma.cc/995S-BFRJ.
[51] Elisabeth Bumiller & Erica L. Green, *Trump Fires Black Officials From an Overwhelmingly White Administration*, N.Y. Times (Oct. 8, 2025), https://perma.cc/PZ5Q-KE47.

mandated and even where workers, in fact, were not advocating on behalf of protected groups as part of their job responsibilities.

145.    For example, at the Department of Education, dozens of employees were placed on administrative leave or RIF'd simply because they attended a "Diversity Change Agent Program" training. This voluntary two-day training was established to create employee leaders who would support civil rights and equal employment mandates by promoting meritorious diversity and inclusiveness in employee recruitment and retention, employee engagement, and training and development.[52]

146.    Plaintiff Stainnak was RIF'd due to Stainnak's *prior* work advancing inclusion initiatives for, for example, LGBTQ workers, and Plaintiff Fell was perceived as advocating for protected racial and gender groups based on her work in the Department of Homeland Security's Office of Civil Rights and Civil Liberties, including in her most recent role as Director of the Antidiscrimination Group.

147.    Similarly, proposed Class members include: an operations manager who helped ensure that veterans were not inhibited from accessing earned benefits due to cultural or socioeconomic barriers; a civil rights attorney who helped Americans of all backgrounds access educational opportunity; an FAA air traffic control manager who facilitated team inclusivity so that safety issues could be raised effectively from top to bottom of the team; a DHS worker who ensured language competency at the border to advance intelligence gathering and the safety of ICE officers; an NIH worker who reviewed testing design to ensure that public health information was broadly inclusive of all Americans to avoid the release of misleading health data on untested communities; a social scientist who liaised with community-based organizations to better understand behavioral health outcomes in under-resourced communities; a forestry worker who ensured equitable access of federal lands, to make sharing possible between farmers and hunters; and a public health advisor who helped outreach to LGBTQ communities to ensure that

---

[52] Bob Moser, *Education Department Staffers Suspended for Attending DEI Training*, Inside Higher Ed (Feb. 4, 2025), https://perma.cc/W8C5-9RBY.

epidemics affecting LGBTQ people were promptly identified and addressed for the benefit of all communities.

148.     Because these employees were viewed by the Administration as advocating on behalf of protected racial or gender groups, they were targeted for RIFs.

## V.     NAMED PLAINTIFF ALLEGATIONS

### A.     Stephanie Fell

149.     Plaintiff Fell, a white woman, spent her nearly 20-year federal career as a dedicated employee of DHS under both Republican and Democratic administrations.

150.     She earned her undergraduate degree from The College of the Holy Cross and law degree from Fordham University School of Law.

151.     She is an experienced attorney, mediator, and federal-sector policy advisor with over two decades of legal and policy leadership experience focused on civil rights, disability access, and equitable delivery of public facing programs and activities.

152.     In 2005, she was hired to work as an Attorney Advisor within the Federal Emergency Management Agency's Office of Chief Counsel under the George W. Bush Administration.

153.     She later occupied several other positions in the agency: Trial Attorney, Senior Advisor with the Office of Disability Integration and Coordination, and Acting Team Lead and Senior Policy Advisor with the Office of Civil Rights.

154.     In President Trump's first Administration, Fell was hired as a Senior Policy Advisor with the Department of Homeland Security's Office for Civil Rights and Civil Liberties, where her role involved investigating complaints filed by members of the public alleging that their civil rights had been violated. Allegations included concerns about disability access, language access, and conditions of detention, e.g., concerns related to the alleged lack of COVID-19 prevention protocols to protect individuals in the custody of U.S. Customs and Border Protection. These investigations involved requests for information, interviews, and

coordination with outside experts and resulted in policy recommendations issued to the DHS component agency involved if the allegations were substantiated.

155.    In August 2022, due to her consistently excellent performance reviews, relevant experience, and leadership skills, Fell applied for and was hired as a Supervisory Program Analyst and Deputy Director, a new position with the Antidiscrimination Group in CRCL's Programs Branch.

156.    In December 2024, Fell was promoted to Director of the Antidiscrimination Group (GS-0343-15). In this role, she assisted both the Officer for CRCL in fulfilling their duties and DHS in observing its statutory obligations, such as compliance with Title VI of the Civil Rights Act and Section 504 of the Rehabilitation Act.

157.    On January 30, 2025, Fell and seven of her DHS colleagues were called to a meeting convened by her supervisor, Peter Mina, and various other members of DHS management. At the meeting, Mina indicated that OPM and DHS's Office of the Chief Human Capital Officer directed DHS to implement the new EOs targeting DEI. He further stated that, as part of the directive, he was required to provide Fell's and her colleagues' names to OPM as staff "engaged in DEI work as of November 5, 2024" and to immediately put them on administrative leave.

158.    Mina followed the directive and, later that day, Fell received a memo confirming that she had been placed on administrative leave. That memo's language was nearly identical to one of the templates attached to OPM's January 21, 2025, initial directive.

159.    Fell questioned the decision to place her on leave because, at the time she was placed on leave, she had not been performing duties relating to President Biden's EO 14035. DHS provided no explanation.

160.    Immediately after being placed on administrative leave, Fell was directed to surrender her government-issued equipment, eliminating her access to her government email, electronic files, and internal systems.

161.    A few months later, while Fell was on leave, she received a memo notifying her that her employment was being terminated. That memo stated that "[a] reduction in force within [her] competitive area has been conducted with an effective date of March 21, 2025[,]" because of "dissolution of the [sic] Office of [sic] Civil Rights and Civil Liberties." The memo further stated that, in accordance with EO 14210, her "position of SUPERVISORY PROGRAM ANALYST within CRCL is being abolished." It then represented that she had no assignment right to another position in her competitive area and that she would be separated from federal service on May 27, 2025.

162.    Contrary to this statement in Fell's RIF notice and in violation of federal regulations governing RIFs, DHS officials have since admitted under oath that CRCL was not dissolved. DHS Executive Director Nicole C. Barksdale-Perry, who signed Fell's RIF notice explaining that she had no right to reassignment because CRCL was being dissolved, later admitted in a sworn declaration that "[t]he language [of the RIF notices] . . . was intended to communicate our understanding of the lack of available positions in these offices for possible reassignments. It was not intended to suggest that DHS had long-term plans for the elimination of these offices[.]"[53] And, indeed, other department officials confirmed that CRCL would continue to function, create new positions, and seek applicants.[54]

163.    Unlike Fell, federal colleagues who were not identified as engaged in DEI-related work retained access to internal governmental systems and communications, enabling them to receive and pursue internal opportunities for career transition programs denied to Fell. Fell observed that white, male employees were largely protected from separation due to the anti-DEI EO purge even if they held similar roles as Fell and other women and people of color.

164.    As a result of the challenged conduct, Fell has suffered financial, emotional, and reputational harms.

---

[53] Barksdale-Perry Decl., *Kennedy v. DHS*, No. 1:25-cv-1270 (D.D.C. May 22, 2025), Dkt. No. 32-1.
[54] Joint Status Report, *Kennedy v. DHS*, No. 1:25-cv-1270 (D.D.C. May 27, 2025), Dkt. No. 39.

B.    **Stephanie Gilliard**

165.    For approximately 17 years, Plaintiff Gilliard, a Black woman, served her country as a dedicated federal employee under both Republican and Democratic administrations.

166.    She earned a Bachelor of Arts in Journalism, (Public Relations & Marketing), cum laude, from Benedict College, and a Master of Public Administration degree (Human Resources/Finance) from Clark Atlanta University.

167.    Gilliard joined the federal government under the George W. Bush Administration and worked in various federal agencies. She primarily served as a senior human resources professional, first as a Senior Employee and Labor Relations Specialist at the Environmental Protection Agency; then as a Human Resources Officer at the U.S. Mint; followed by a Human Capital/Employee and Labor Relations leader at the Federal Housing Finance Agency; and later as a Supervisory Human Resources Specialist and Program Coordinator at DOJ's Executive Office for Immigration Review (EOIR).

168.    At the DOJ, Gilliard managed staffing and classification, labor and employee relations, reasonable accommodation programs, HR policy, recruitment, and workforce planning across multiple components.

169.    In October 2023, when Gilliard was working in the DOJ's EOIR, she was reassigned from her role as a Supervisory Human Resources Management Specialist in the Office of Human Resources (GS-0343-14) to be a DEIA Coordinator in the Office of Communications and Legislative Affairs (GS-0301-14).

170.    On October 12, 2023, shortly after her reassignment, Gilliard filed a grievance objecting to the transfer, which she had not sought and did not want, but that grievance was to no avail, and she continued to be assigned to DEI work.

171.    On February 21, 2025, Gilliard received a memo notifying her that, pursuant to EO 14151, her employment would be terminated as part of a RIF. That memo stated that "[a] reduction in force within [her] competitive area will be conducted effective April 22, 2025[,]" because of "the dissolution of the Diversity, Equity, Inclusion & Accessibility program within

[EOIR]." The memo further stated that her "position of Diversity Program Manager [was] being abolished," that she "w[ould] be released from [her] competitive level," and that she did "not have an assignment right to another position in [her] competitive area."

172.    Gilliard's RIF memo, like that of the other Plaintiffs, tracks the structure and language of OPM's sample RIF documents, and is consistent with OPM's offer to provide agencies with tailored RIF language upon request to facilitate their implementation of the Anti-DEIA EOs.

173.    Notably, DOJ unlawfully violated 5 C.F.R. § 351.403 by carving out a competitive level defined solely as "DEI" and then populated that area with a single employee—Plaintiff Gilliard—according to the retention register for the GS-0301-14 DEI/IDEA position, which lists only her name. By structuring the competitive level around a one-person unit, the DOJ ensured that Gilliard, who was qualified to fill many other government positions, would be separated regardless of her tenure, performance, or qualifications, as required under federal employee law. Gilliard's first and second line supervisors, both white, who approved and oversaw her DEI work, were not included in the RIF.

174.    As a result of the challenged conduct, Gilliard has suffered financial, emotional, and reputational harms.

**C.    <u>Mahri Stainnak</u>**

175.    For over 16 years, Plaintiff Stainnak, who is white and non-binary, served the country as a dedicated federal employee under both Republican and Democratic administrations.

176.    Stainnak holds a Master of Science degree in Science, Technology, and Environmental Policy from the University of Minnesota's Humphrey School of Public Affairs and a Bachelor of Science in Environmental Science, with additional studies in Spanish and Economics, from the University of North Carolina Asheville.

177.    In 2008, during the George W. Bush Administration, Stainnak began work for the EPA in the Office of Enforcement and Compliance Assurance, and subsequently worked in

several other EPA offices, including focusing on Clean Water Act enforcement, environmental policy and justice, civil rights, continuous improvement, and workforce engagement.

178.    In 2021, Stainnak transferred to OPM to work on policies supporting the opportunity for advancement and inclusion of individuals from all segments of society in the federal government, including LGBTQ federal workers, ensuring that they could work effectively and efficiently in the federal workplace no matter their identity or background. The following year, Stainnak was promoted to Deputy Director of OPM's Office of DEIA.

179.    In December 2024, Stainnak accepted a new position as Director of OPM's Talent Innovation Group—a group located outside of OPM's DEIA Office. Their reassignment to OPM's Talent and Innovation Group was effective January 12, 2025, and they were fully engaged in the duties of their new position before the anti-DEI EOs issued. In Stainnak's new position, they worked to identify and implement practices to recruit and retain top federal talent, including people with unique technical skills. This work did not focus on LGBTQ issues and was not DEI-related.

180.    On January 21, 2025, Acting Director of OPM Charles Ezell sent Stainnak a memo notifying them that they were immediately and indefinitely being placed on administrative leave.

181.    On January 23, 2025, OPM cancelled Stainnak's already effective reassignment to OPM's Talent and Innovation Group. That same day, Ezell sent Stainnak a memo notifying them that, pursuant to EO 14151, their employment would be terminated as part of a RIF of the Office of Diversity, Equity, Inclusion & Accessibility. Stainnak, no longer working in ODEIA, was RIF'd from a position they had left, swept up into a competitive area that was defined as, "Office of Diversity, Equity, Inclusion, and Accessibility, Washington, D.C." Stainnak's duty station at the time was South Portland, ME.

182.    Stainnak is aware of dozens of federal workers that were targeted due to the anti-DEI EOs. Many of these workers are Black women and others are women, other people of color, and LGBTQ individuals; none are straight, white males.

183.    As a result of the challenged conduct, Stainnak has suffered financial, emotional, and reputational harms. Given the unexpected and wholly unwarranted termination, Stainnak had no time to prepare for this career change and, to date, has been unable to secure comparable employment.

     **D.**    **L.L. Smith**

184.    Plaintiff L.L. Smith, a Black woman, was appointed to the NIH on April 21, 2024. She holds a Bachelor of Science degree in Psychology from Howard University and a Master of Public Health – Epidemiology degree from Walden University. She is an accomplished public health leader whose work has advanced health equity through evidence-based policy and research.

185.    As a program manager at the Satcher Health Leadership Institute at Morehouse School of Medicine, she co-authored studies on health policy training and the structural determinants of disparities, with her scholarship cited across public health and medical literature. Her career reflects a sustained commitment to empowering underserved communities, particularly through HIV prevention, community engagement, and leadership development in public health. In her first performance appraisal at the Agency, Smith received a rating of 4 out of 5.

186.    While Smith had been performing certain duties related to President Biden's EO 13985, this changed after the election. On January 12, 2025, the NIH formally reassigned Smith to the "Resource Specialist" role (GS-0301). In that reassignment, Smith performed programmatic, grant and EEO-adjacent functions.

187.    The NIH's Office of Equity, Diversity and Inclusion, where Smith's position resided, contemporaneously initiated a "Proposal to Align the NIH Equal Employment Opportunity Program with Administration Priorities." The office changed its focus to enforcing anti-discrimination laws and ceased doing DEI work. As part of that change, the NIH changed the Strategic Diversity and Inclusion Branch to the Strategic Initiatives and Engagement Branch, discontinued work on the NIH-wide DEIA Strategic Plan, and returned staff to

statutorily-required equal employment responsibilities. The NIH did not close the Office in which Smith worked. It remained in operation to enforce federal EEO laws.

188.    Despite her reassignment into a non-DEI role and the continued operation of her Office, Smith was placed on administrative leave on January 24, 2025 and instructed to stop all work, surrender her government-issued equipment, and return materials by February 28, 2025. Her access to NIH systems and email were also revoked.

189.    On January 30, 2025, NIH's Office of Human Resources emailed Smith, informing her that "[w]e have been informed by HHS that employees previously performing DEIA work and are on administrative leave are eligible for the OPM Deferred Resignation Program."

190.    On February 14, 2025, despite the January 30 email associating her administrative leave with prior DEIA work, the NIH issued a "Notification of Termination During Probationary Period" letter to Smith stating the rationale for Smith's removal as "lack of fit, qualifications, and poor performance." This narrative directly contradicted her recent positive performance appraisal. The NIH provided no revised performance-based documentation to justify the abrupt reversal, and Smith's director told her that their team had been "targeted and reported," with multiple colleagues in her department being separated.

191.    On July 16, 2025, HHS issued an "Amended Notice of Termination of Employment due to Reduction in Force (RIF)," confirming that her position had been abolished and that she was separated effective July 14, 2025. A July 21, 2025 supplemental RIF letter, confirmed Smith's severance.

192.    Smith observed that white, male employees were largely protected from separation due to the anti-DEI EO purge even if they held similar roles as Smith and other women and people of color.

193.    Smith's claims are properly exhausted through the EEO process. Smith initiated her EEO complaint on March 10, 2025, alleging discrimination tied to the anti-DEI executive orders and their implementation. After more than 180 days elapsed without assignment of an

investigator, and, as confirmed by NIH's September 16, 2025 communication issuing a "Stop Work Order" halting all EEO counseling, Smith's attempts to pursue her administrative remedies were stymied by the Agency's own failure to provide the mandated EEO counseling for federal workers. On November 24, 2025, fully 259 days after she filed a specific and detailed initial complaint, the agency EEO office made contact to discuss "next steps." Smith had timely followed the Agency's procedures to file an initial complaint and had, long before, given the Agency an opportunity to correct its own errors. The Agency, however, has failed to make available timely EEO counseling and failed to act to create a record for judicial review. Requiring further delay for administrative review would prejudice Plaintiff Smith's court action. Because of agency inaction on her complaint for more than 180 days, she has thus presumptively exhausted under 29 C.F.R. § 1614.407(b). As a result, her discrimination claims are properly before this Court. She has also exhausted the administrative process for First Amendment Claims by filing a complaint with the U.S. Office of Special Counsel pursuant to 5 U.S.C. § 1214(a)(1)(A).

194.    As a result of the challenged conduct, Smith has suffered financial, emotional, and reputational harms. Given the unexpected and wholly unwarranted termination, Smith has been unable to secure comparable employment.

## VI.    CLASS ALLEGATIONS

195.    Plaintiffs bring this action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and a class of all federal employees who, prior to judgment, have been subject to separation from the federal government pursuant to the anti-DEI EOs and/or OPM's implementing directives ("the Class").

196.    Plaintiffs will seek to certify the following subclasses:

a.    **Title VII Gender Subclass (All Plaintiffs)**: All federal employees who are women or non-binary who, prior to judgment, have been subject to separation from the federal government pursuant to the anti-DEI EOs and/or OPM's implementing directives.

b.      **Title VII Race/Ethnicity Subclass (Plaintiffs Gilliard and Smith)**: All federal employees who are African American/Black, Hispanic/Latino, Asian American/Pacific Islander, or Native American/Indigenous who, prior to judgment, have been subject to separation from the federal government pursuant to the anti-DEI EOs and/or OPM's implementing directives.

197.    Excluded from the classes are: (a) any judge assigned to this case, their staff, and immediate family members; and (b) any person who timely opts out of the Class.

198.    Plaintiffs reserve the right to modify the Class and Subclass definitions as additional information becomes available during discovery.

A.      **Numerosity (Fed. R. Civ. P. 23(a)(1))**

199.    The proposed Class is so numerous that joinder of all members is impracticable. While the exact number of affected employees is unknown, public reporting indicates that it is potentially in the thousands.[55] The same is true of each anticipated subclass: Plaintiffs are aware of (1) more than 40 women and/or non-binary individuals and (2) more than 40 people of color who were subject to a RIF in connection with the anti-DEI EOs and implementing directives.

200.    The exact number of Class members and Subclass members can be determined through government employment records, the agency lists sent to OPM pursuant to its implementing directives, and/or OPM's agency-wide compliance report.

B.      **Commonality (Fed. R. Civ. P. 23(a)(2))**

201.    There are questions of law and fact common to all Class members, including but not limited to:

a.      Whether Defendants violated the First Amendment rights of Class members by firing them based on their actual or perceived political affiliation.

---

[55] Emma Burleigh, *America Will See its Largest Mass Resignation in History as 100,000 Federal Workers are Set to Quit Their Jobs Today*, Fortune (Sept. 30, 2025), https://perma.cc/C4UD-NVGE; Andrea Hsu, *Trump Calls DEI programs 'Illegal.' He Plans to End Them in the Federal Government*, NPR (Jan. 23, 2025), https://perma.cc/VV6R-BFP5 (estimating dozens to over 100 affected workers in Labor Department alone).

b.      Whether Defendants unlawfully discriminated against Class members based on their actual or perceived political affiliation in violation of the CSRA.

c.      Whether Defendants unlawfully discriminated against the Class, and/or Subclass members based on race and/or gender, under disparate impact and/or disparate treatment theories, in violation of Title VII.

d.      Whether Defendants unlawfully targeted employees based on their perceived advocacy for protected gender or racial groups, in violation of Title VII.

e.      Whether Defendants unlawfully discriminated against the Class, and/or Subclass members based on their race and/or gender, in violation of the CSRA.

f.      Whether Defendants unlawfully deviated from RIF regulations in order to target Class members for removal from federal service.

202.    The Class's claims arise from a common policy or practice—the anti-DEI EOs and implementing directives, which were all implemented across agencies in a uniform way according to a common set of directives—that gives rise to shared legal questions.

**C.      Typicality (Fed. R. Civ. P. 23(a)(3))**

203.    Plaintiffs' Class and Subclass claims are typical of the claims of the proposed Class and/or Subclasses because they arise from the same executive actions, factual circumstances, and legal violations. Like other Class and/or Subclass members, Plaintiffs were federal workers targeted for adverse employment actions pursuant to the anti-DEI EOs and/or OPM's implementing directives.

**D.      Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

204.    Plaintiffs will fairly and adequately protect the interests of the Class and/or Subclasses. Plaintiffs have no conflicts with other Class and/or Subclass members and have retained counsel experienced in complex employment discrimination, federal worker rights, and class action litigation.

**E.    Declaratory and Injunctive Relief Appropriate to Whole (Fed. R. Civ. P. 23(b)(2))**

205.    Defendants acted on grounds generally applicable to the Class and/or Subclasses, making declaratory and injunctive relief appropriate under Rule 23(b)(2).

**F.    Predominance and Superiority Supporting Damages (Fed. R. Civ. P. 23(b)(3))**

206.    A class action is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class and/or Subclasses, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Proceeding as a class action will avoid duplicative and inconsistent individual suits. In the absence of a Class, many affected employees otherwise may lack the resources to pursue individual litigation and protect their rights.

207.    The Class and Subclass Members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices. Defendants have computerized personnel and payroll data that will facilitate efficient calculation of damages.

**G.    The Court Should Appoint the Undersigned as Class Counsel (Fed. R. Civ. P. 23(g))**

208.    The undersigned counsel are experienced class action, First Amendment, and/or employment attorneys, who are qualified to represent the Class.

**VII.    CLAIMS FOR RELIEF**

### CLAIM 1

**Retaliation**
**First Amendment to the United States Constitution**
**(On Behalf of All Plaintiffs and the Class)**

209.    This Claim is brought by all Plaintiffs on behalf of themselves and the Class.

210.    The First Amendment prohibits retaliation against individuals for their speech, including their actual or perceived political beliefs and associations.

211.    The anti-DEI EOs and implementing directives targeted Plaintiffs and the Class for adverse treatment based on Defendants' belief that they are political enemies of the Trump Administration, have a "woke ideology," are "far left" or "Marxist," and/or are members of or support the Democratic Party, all due solely to their association—or perceived association—with DEIA based on their job title, perceived job duties, or the government jobs they performed prior to their termination.

212.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs and the Class have suffered lost compensation, emotional distress, and other damages.

213.    Plaintiffs seek declaratory and injunctive relief including reinstatement, restoration of seniority, expungement of references to their terminations from their federal employment records, and any other relief this Court deems just and proper.

## CLAIM 2

### Intentional Discrimination (Advocacy)
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
### (On Behalf of All Plaintiffs and the Class)

214.    This Claim is brought by all Plaintiffs on behalf of themselves and the Class. Plaintiffs Fell, Gilliard, and Stainnak timely filed appeals with the MSPB, and Plaintiff Smith timely filed an EEO claim, and thus all have exhausted their administrative remedies.

215.    Defendants have engaged in an intentional, government-wide, and systemic policy, pattern, and/or practice of discrimination against Plaintiffs and the Class in adopting and implementing the anti-DEI EOs and related directives for the purpose of punishing workers who advocate for or are perceived to advocate for Americans who belong to protected gender or racial communities. Despite being on notice of the adverse impact of these orders and their implementing instructions, Defendants knowingly maintained these directives causing harm to Plaintiffs and the Class.

216.    As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiffs and the Class have suffered damages including, but not limited to,

lost past and future income, compensation, and benefits. Plaintiffs seek compensatory damages for themselves and the Class.

217.    Plaintiffs seek damages and also declaratory and injunctive relief, including reinstatement, restoration of seniority, expungement of references to their terminations from their federal employment records, and any other relief this Court deems just and proper.

## CLAIM 3

### Intentional Discrimination (Gender)
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
### (On Behalf of All Plaintiffs and the Gender Subclass)

218.    This Claim is brought by all Plaintiffs on behalf of themselves and the Gender Subclass. Plaintiffs Fell, Gilliard, and Stainnak timely filed appeals with the MSPB, and Plaintiff Smith timely filed an EEO claim, and thus all have exhausted their administrative remedies.

219.    Defendants have engaged in an intentional, government-wide, and systemic policy, pattern, and/or practice of discrimination against Plaintiffs and the Gender Subclass they represent in violation of Title VII by intentionally targeting employees who are women or non-binary.

220.    As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiffs and the Gender Subclass have suffered damages including, but not limited to, lost past and future income, compensation, and benefits. Plaintiffs seek compensatory damages for themselves and the Gender Subclass.

221.    Plaintiffs seek damages and also declaratory and injunctive relief, including reinstatement, restoration of seniority, expungement of references to their terminations from their federal employment records, and any other relief this Court deems just and proper.

## CLAIM 4

### Intentional Discrimination (Race/Ethnicity)
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
### (On Behalf of Plaintiffs Gilliard and Smith and the Race/Ethnicity Subclass)

222.    This Claim is brought by Plaintiffs Gilliard and Smith on behalf of themselves and all Class members of color (*i.e.*, Black/African American, Hispanic/Latino,

Indigenous/Native American, Asian American/Pacific Islander). Plaintiff Gilliard timely filed an appeal with the MSPB, and Plaintiff Smith timely filed an EEO claim, thus exhausting their administrative remedies.

223.    Defendants have engaged in an intentional, government-wide, and systemic policy, pattern, and/or practice of discrimination against Plaintiffs Gilliard and Smith and the Race/Ethnicity Subclass they represent in violation of Title VII by intentionally targeting employees who are people of color.

224.    As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiffs Gilliard and Smith and the Race/Ethnicity Subclass have suffered damages including, but not limited to, lost past and future income, compensation, and benefits. Plaintiffs Gilliard and Smith seek compensatory damages for themselves and the Race/Ethnicity Subclass.

225.    Plaintiffs Gilliard and Smith seek damages and also declaratory and injunctive relief, including reinstatement, restoration of seniority, expungement of references to their terminations from their federal employment records, and any other relief this Court deems just and proper.

## CLAIM 5

### Disparate Impact Discrimination
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
### (On Behalf of All Plaintiffs and the Gender Subclass)

226.    This Claim is brought by all Plaintiffs on behalf of themselves and the Gender Subclass. Plaintiffs Fell, Gilliard, and Stainnak timely filed appeals with the MSPB, and Plaintiff Smith timely filed an EEO claim, and thus all have exhausted their administrative remedies.

227.    The anti-DEI EOs and implementing directives have had an adverse impact on Plaintiffs and the Gender Subclass which cannot be justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

228.    As a direct and proximate result of Defendants' discriminatory actions, Plaintiffs and the Class have suffered lost compensation and other economic damages.

229.    Plaintiffs seek damages and also declaratory and injunctive relief, including reinstatement, restoration of seniority, expungement of references to their terminations from their federal employment records, and any other relief this Court deems just and proper.

### CLAIM 6

**Disparate Impact Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***
**(On Behalf of Plaintiffs Gilliard and Smith and the Race/Ethnicity Subclass)**

230.    This Claim is brought by Plaintiffs Gilliard and Smith on behalf of the Race/Ethnicity Subclass. Plaintiff Gilliard timely filed an appeal with the MSPB, and Plaintiff Smith timely filed an EEO claim, thus exhausting their administrative remedies.

231.    The anti-DEI EOs and implementing directives have had an adverse impact on Plaintiffs and the Race/Ethnicity Subclass which cannot be justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

232.    As a direct and proximate result of Defendants' discriminatory actions, Plaintiffs and the Class have suffered lost compensation and other economic damages.

233.    Plaintiffs seek damages and also declaratory and injunctive relief, including reinstatement, restoration of seniority, expungement of references to their terminations from their federal employment records, and any other relief this Court deems just and proper.

### CLAIM 7

**Violations of the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 2302 *et seq.***
**(On Behalf of Plaintiffs Fell, Gilliard, and Stainnak, and the Class)**

234.    Federal workers like Plaintiffs and the Class are subject to the protections of Title V of the United States Code.

235.    Defendants separated Plaintiffs and the Class from federal service pursuant to directives from OPM, resulting in RIFs that were contrary to law and denied Plaintiffs and class

members legally required transfer, retention or assignment under the CSRA and 5 C.F.R. Part 351.

236.    Defendants' separation of Plaintiffs and the Class from their positions of record and from federal service is unlawful because the removals:

      a.     violate RIF procedures, denying Plaintiffs and the Class protections and rights guaranteed by 5 C.F.R. Part 351;

      b.     are prohibited personnel practices under 5 U.S.C. § 2302(b)(1)(A), discriminating on the basis of race and/or sex, in violation of Title VII;

      c.     are prohibited personnel practices under 5 U.S.C. § 2302(b)(1)(e), discriminating on the basis of perceived or presumed partisan political affiliation; and

      d.     are prohibited personnel practices under 5 U.S.C. § 2302(b)(12), infringing upon the fundamental rights guaranteed by the First Amendment to the U.S. Constitution and the Merit System Principles described in 5 U.S.C. §§ 2301(b)(2) and (8)(a).

237.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs and the Class have suffered lost compensation, emotional distress, and other damages; accordingly, they seek compensatory damages.

238.    Plaintiffs seek damages and also declaratory and injunctive relief including reinstatement and any other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and/or Subclasses, pray for judgment against Defendants, awarding relief as follows:

      a.    Certify the proposed Class and Subclasses under Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiffs as Class representatives and Subclass representatives and their counsel as Class Counsel;

      b.    Declare that the anti-DEI EOs and implementing directives are unlawful;

c. Require Defendants to expunge references to termination from records, restore federal service seniority as if unlawful terminations had not occurred, and otherwise provide rightful place relief to Class members;

d. Order reinstatement and back pay, lost benefits, and compensatory, and/or other relief necessary to make Plaintiffs whole or to deter misconduct;

e. Award pre-judgment and post-judgment interest on all monetary damages, including back pay and lost benefits, to compensate Plaintiffs for their losses;

f. Award reasonable attorneys' fees and litigation costs incurred in pursuing this action; and

g. Grant all other general, special, and equitable relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury on all counts so triable.

Dated: December 3, 2025          Kelly M. Dermody (D.C. Bar No. 90032320)

*/s/ Edward Baker*
Edward Baker (D.C. Bar No. 1643616)
Jessica A. Moldovan (NY Bar No. 5615943) (pro hac vice motion forthcoming)
Jahi J. Liburd (NY Bar No. 6015812) (pro hac vice motion forthcoming)
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street 8th Floor
New York, NY 10013
Tel.: (212) 355-9500
kdermody@lchb.com
ebaker@lchb.com
jmoldovan@lchb.com
jliburd@lchb.com

Mary E. Kuntz (D.C. Bar No. 1000482)
Anna Kathryn B. Barry (D.C. Bar No. 1719493)
Hector Ruiz (D.C. Bar No. 90035280)
Kalijarvi, Chuzi, Newman & Fitch P.C.
818 Connecticut Ave., NW, Suite 1000
Washington, D.C. 20006
Tel.: (202) 331-9260
Fax: (866) 452-5789
mkuntz@kcnlaw.com
akbarry@kcnlaw.com
hruiz@kcnlaw.com

Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel.: (202) 457-0800
smichelman@acludc.org
ashah@acludc.org

*Attorneys for Plaintiffs and the Class*