# Exhibit D

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

| | |
|---|---|
| STEPHANIE FELL █████████████ ████████ *individually and on behalf of all others similarly situated,* | DOCKET NUMBER: not yet assigned |
| Appellants, | DATE: June 20, 2025 |
| v. | |
| Donald J. Trump, in his official capacity as President of the United States; | |
| Office of Personnel Management; Charles Ezell, in his official capacity as Acting Director of the Office of Personnel Management; and | |
| Office of Management and Budget; Matthew Vaeth, in his official capacity as Acting Director of the Office of Management and Budget; | |
| U.S. Department of Justice; Pamela Bondi, in her official capacity as Attorney General; | |
| U.S. Department of Homeland Security; Kristi Noem, in her official capacity as Secretary, | |
| et al. (Appendix A). | |
| Respondents. | |

### APPELLANTS' NOTICE OF APPEAL
### AND REQUEST FOR ADJUDICATION AS A CLASS

This is a class action appeal filed by Appellants Stephanie Fell and █████████ on

behalf of the following class: All persons who were subject to separation from federal service at

any agency due to Executive Order 14151 ("EO 14151"), *Ending Radical and Wasteful Government DEI Programs and Preferences*, Executive Order 14173 ("EO 14173"), *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, and/or because the government associated them with the concepts of "diversity, equity, and inclusion" and/or "diversity equity, inclusion, and accessibility" between January 20, 2025 and the first day of a hearing on Appellants' and putative class members' claims.[2] As such, the filing of this putative class action tolls the time to file individual appeals for persons encompassed in the class, as defined. 5 C.F.R. §§ 1201.27 (a)-(b).

The government-wide separation of all employees who performed or were perceived as associated with Diversity, Equity, and Inclusion ("DEI") work ("DEI-affiliated employees") by reductions in force ("RIF") in violation of the governing regulations, 5 C.F.R. § 351, is unlawful. Appellants were subject to an unlawful RIF by the Department of Homeland Security (the "Agency"), at the direction of the President's Executive Orders and guidance from the Office of Personnel Management ("OPM"). Appellants request that this matter be heard as a class appeal under 5 C.F.R. § 1201.27, as a class appeal is the fairest and most efficient way to adjudicate the appeal and the representative party will adequately protect the interests of all parties. *Id.* § 1201.27(a). This appeal satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, which guides the Administrative Judge in determining whether it is appropriate to treat an appeal as a class action. *Id.* § 1201.27(c).

Appellants further request that the Administrative Judge set a limited discovery schedule to permit development of the record supporting class certification. *See Beasley v. Internal*

---

[2] This Notice of Appeal uses the term Diversity, Equity, and Inclusion ("DEI") interchangeably with Diversity, Equity, Inclusion, and Accessibility ("DEIA").

2

*Revenue Serv.*, 15 M.S.P.R. 16, n.7 (1983).

## I.    THE ANTI-DEI EXECUTIVE ORDERS

On January 20, 2025, President Trump signed EO 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, ordering federal agencies to terminate DEI-related "preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." Ex. 3, EO 14151. This EO also directs the Office of Management and Budget, with the assistance of the Attorney General, to terminate "all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities" across the federal government. *Id.* Explicitly reversing President Biden's Executive Order 13985, the EO declared an end to DEI and DEIA programs, but failed anywhere to provide a definition of those terms.[3] *Id.* The following day, on January 21, 2025, President Trump signed EO 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, which asserts that federal agencies' use of DEI or DEIA is '[i]llegal" and "*violate[s] the text and spirit of our longstanding Federal civil-rights laws*[.]" *See* Ex. 4, EO 14173.[4] Although "illegal DEI and DEIA policies" are addressed repeatedly in this second anti-DEI EO, the EO fails to define what that term means beyond characterizing it as "dangerous, demeaning, and immoral race- and sex-based preferences." *Id.*

OPM issued guidance via two memoranda to all federal agencies to carry out the EOs' directives. Ex. 5, OPM Initial Guidance Regarding DEIA Executive Orders (Jan. 21, 2025); *see*

---

[3] Biden's EO 13985 used the term "equity" throughout, but nowhere employs either DEI or DEIA (or the terms the acronyms represent).

[4] This Notice of Appeal uses the term "anti-DEI EOs" to refer to EOs 14151 and 14173, Exs. 3 and 4.

*also* Ex. 6, OPM Guidance Regarding DEIA Offices (Jan. 24, 2025). Specifically, OPM directed agencies to issue RIF notices to all "*employees* who work in a DEIA office[,]" Ex. 5 at 2 (emphasis added), with the instruction to define the competitive area "solely in terms of the DEIA office where the employees worked[.]" Ex. 6. The January 21 OPM memorandum further instructed all agency heads to "report to OPM . . . a complete list of DEIA offices and any employees who [*sic*] in those offices **as of November 5, 2024**." Ex. 5 at 2. OPM defined DEIA offices to include "the offices and agency sub-units focusing exclusively on DEIA initiatives and programs[.]" *Id.* at 1. In its January 24 memorandum, OPM ordered agencies to terminate all DEIA "**offices and positions**[.]" Ex. 6.

DEI is again singled out as the basis for "large-scale reductions in force" in a later EO issued by the President on February 11, 2025. EO 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, directed, among other things, that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, *including all agency diversity, equity, and inclusion initiatives*" Ex. 7 (EO 14210) (emphasis added). The term "Diversity, Equity, and Inclusion offices" identified by the anti-DEI EOs and OPM guidance loses definition still more with the use of the broadening term "initiatives" to replace "offices."

## II.    APPELLANTS WERE SUBJECTED TO UNLAWFUL RIFS

### A.    Factual Background

Congress established an Officer for Civil Rights and Civil Liberties ("CRCL") for DHS

under 6 U.S.C. § 345, which provides that the Officer shall review and investigate violations of civil rights and civil liberties by the Department of Homeland Securities and oversee the Department's compliance with "constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities of the Department[.]" 6 U.S.C. § 345(a). CRCL is responsible for a wide range of activities, including Compliance (responsible for "investigat[ing] complaints from the public alleging violations of civil rights and civil liberties in DHS activities"), Programs (responsible for providing "policy advice to the Department on civil rights and civil liberties" related to antidiscrimination, community engagement, immigration, and security, intelligence, and information), and Equal Employment Opportunity (EEO) (responsible for "direct[ing] the Department's EEO policies," including processing EEO complaints, providing leadership, guidance, and technical assistance to DHS Components on the Department's EEO initiatives," and "enforcing compliance with EEO laws, regulations, and mandates"). U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, https://www.dhs.gov/office-civil-rights-and-civil-liberties (last visited June 17, 2025).

Appellant Stephanie Fell, GS-0343-15, worked at the CRCL office in Washington, D.C., where she held the title of Director. *See* Ex. 2(B) (Fell SF-50); Ex. 8 at ¶ 5 (Fell Decl.). Appellant Fell supported the CRCL Officer in fulfilling CRCL's statutory mandate. Ex. 8 at ¶ 7. On January 30, 2025, Appellant Fell was notified that she was placed on administrative leave because the Agency identified her as a DEI-affiliated employee and pursuant to the anti-DEI EOs. Ex. 8 at ¶ 9-11. She was told that the Agency communicated to OPM that she was "engaged in DEI work as of November 5, 2024." Ex. 8 at ¶ 10. Appellant Fell received no explanation from DHS regarding why she was identified as "engag[ing] in DEI work." Ex. 8 at ¶

5

12. Appellant Fell did not do work associated with the prior Administration's Executive Order 14035 (DEIA in the Federal Workforce). *Id.* Appellant Fell was a Director within CRCL who supported the statutorily mandated CRCL Officer and whose job fulfilled certain of CRCL's statutory obligations, such as compliance with Title VI of the Civil Rights Act and Section 504 of the Rehabilitation Act. Ex. 8 at ¶¶ 6-7; Ex. 2(E) (Fell 2024 Performance Appraisal).

While on administrative leave, Appellant Fell received a RIF Notice, which stated that her position was being abolished and that she had no assignment right to another position in her competitive area. Ex. 2(D) (Fell RIF Notice). The Notice stated that this RIF was "a result of the dissolution of [the] Office of Civil Rights and Civil Liberties (CRCL)" and in accordance with EO 14210, the EO ordering agencies to prioritize RIFs of "all agency diversity, equity, and inclusion initiatives." Ex. 2(D); Ex. 7 (EO 14210). The Notice further stated: "[y]our position and all positions in your competitive level are being abolished, therefore there is no one with lower standing that you can displace in your competitive area." Ex. 2(D). Appellant Fell's competitive level was designated as A0A0; her adjusted SCD 3/6/1986. *Id.* The Notice informed Appellant Fell that she would be separated from federal service pursuant to the RIF on May 27, 2025. *Id.*





DHS officials have since provided evidence that CRCL has not been dissolved.[5] DHS HRMS Executive Director Nicole C. Barksdale-Perry, who signed Appellants' RIF notices explaining that they had no right to reassignment because CRCL was being dissolved (Ex. 1(D); Ex. 2(D)), later admitted in a sworn declaration that "[t]he language [of the RIF notices] . . . was intended to communicate our understanding of the lack of available positions in these offices for possible reassignments. It was not intended to suggest that DHS had long-term plans for the elimination of these offices[.]" Ex. 11 at ¶ 7 (Barksdale-Perry Decl. in *Robert F. Kennedy Human Rights, et al. v. Dep't of Homeland Sec'y*, Case No. 1:25-cv-1270-ACR (D.D.C.)). Barksdale-Perry further explained that "[t]he RIFs were structured to eliminate all positions in

---

[5] The website for CRCL states that CRCL "continues to exist and will perform its statutorily required functions." Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security, https://www.dhs.gov/office-civil-rights-and-civil-liberties (last visited June 1, 2025).

8

[CRCL], excluding employees at the Senior Executive Service (SES)" Ex. 11 at ¶¶ 3, 6. The Principal Deputy Chief of Staff and Acting Officer for CRCL declared that, following the RIF, CRCL would be staffed with, in addition to himself, "twenty full-time employees to handle casework, and an additional employee to handle report writing and any additional responsibilities." Ex. 13 at ¶ 4 (Troup Hemenway Decl. in *Robert F. Kennedy Human Rights, et al. v. Dep't of Homeland Sec'y*, Case No. 1:25-cv-1270-ACR (D.D.C.)). "Because staffing will take time, the plan is to immediately bring on as many detailees as possible, preferably for rotations of six months to one year each." Ex. 13 at ¶ 4. Other Department officials have confirmed that "[o]ffices will continue to perform their statutorily mandated duties after the RIF takes place." Ex. 12 at ¶ 13 (Ronald Sartini Decl. in *Robert F. Kennedy Human Rights, et al. v. Dep't of Homeland Sec'y*, Case No. 1:25-cv-1270-ACR (D.D.C.)).

DHS takes the position that following the RIF effected at the end of May, "the Offices are free to create new positions and seek applicants." Ex. 14 at 1 (May 27, 2025 Agency Status Report in *Robert F. Kenedy Human Rights, et al. v. Dep't of Homeland Sec'y*, Case No. 1:25-cv-1270-ACR (D.D.C.)). As of May 27, 2025 (the date of the filing of the Joint Status Report), the representative for DHS asserted that it "has posted solicitations for detailees [to CRCL] on DHS' intranet" and "identified Position Descriptions for restaffing" within the office. Ex. 14 at 1–2. The Agency expected to post the vacancy announcements for CRCL the week of May 26, 2025. *Id.* at 2. The Agency has since posted a job opening on USAJobs for a position with a "primary purpose . . . of lead[ing] or perform[ing] investigative work of civil rights and civil liberties, and EEO inspection and oversight activities nationally, which are vital programs, central to the

9

mission of the agency."[6]

### B. Appellants' Involuntary Separation from Federal Service Is Unlawful

The Agency's separation of Appellants from their positions of record and from federal service is unlawful. Appellants' removals (1) violate RIF procedures required by 5 C.F.R. Part 351; (2) are prohibited personnel practices under 5 U.S.C. § 2302(b)(1)(A), discriminating on the basis of race and/or sex, in violation of Title VII; (3) are prohibited personnel practices under 5 U.S.C. § 2302(b)(1)(e), discriminating on the basis of perceived or presumed partisan political affiliation; and (4) are prohibited personnel practices under 5 U.S.C. § 2302(b)(12), infringing upon the fundamental rights guaranteed by the First Amendment to the U.S. Constitution and the Merit System Principles described in 5 §§ 2301(b)(2) and (8)(a); and (5) violate the APA because, among other reasons, they were conducted so as to eliminate CRCL's functions which are mandated by Congress.

### 1. Appellants' Removals Violate RIF Procedures

The Agency's use of a targeted RIF to remove Appellants from their positions of record and from federal service because of their purported association with "DEI" violates 5 C.F.R. Part 351. First, this RIF violates 5 C.F.R. § 351.201(a)(1) because it was not initiated by the Agency but by President Trump through the anti-DEI EOs and by OPM through its subsequent guidance on the anti-DEI EOs. Specifically, § 351.201(a)(1) vests in "[e]ach agency" the responsibility to determine when positions are to be abolished through use of RIF regulations. An agency is directed to make its own assessment of "the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated." *Id.*

---

[6] The posting indicates that there are "[m]any vacancies in the following location: Washington, D.C." USAJobs, www.usajobs/.gov/job/839008600 (last visited June 18, 2025).

Nevertheless, OPM's guidance implementing EO 14151 directed all agencies to execute a RIF action against "the employees who work in a DEIA office[,]" Ex. 4 at 2, and to take action to terminate "all DEI, DEIA, and 'environmental justice' offices and positions[,]" Ex. 5. The Agency identified Appellants and placed them on administrative leave pursuant to OPM's January 21 and 24 guidance requiring all agencies to provide the names of employees engaged in DEI work as of November 5, 2024, *see* Ex. 10 (███ Administrative Grievance Letter), Ex. 9 at ¶ 7, Ex. 8 at ¶ 10, and later cited EO 14210, which directed agencies to prioritize RIFs of DEI initiatives, in Appellants' RIF Notices, Ex. 1(D) (███ RIF Notice); Ex. 2(D) (Fell RIF Notice). Because the direction to conduct these RIFs came from OPM and the President, it could not have been initiated by the Agency and thus violates 5 USC § 351.201(a)(1).

Second, the Agency targeted for elimination *people*, not positions, in direct violation of law and regulations governing RIFs. The Federal Circuit has been clear: "We have consistently defined a 'reduction in force' as an 'administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions.'" *Tippins v. United States*, 93 F.4th 1370, 1375 (Fed. Cir. 2024); *see also James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) ("A RIF is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions. . . .A RIF is not an adverse action against a particular employee, but is directed solely at a position within an agency."); *Carter v. Dep't of the Army*, 62 M.S.P.R. 393, 398 (1994) (discussing that the focus of a RIF is on positions, while adverse actions are focused on personal characteristics of individuals); *see also Gabriel v. Dep't of Labor*, 108 M.S.P.R. 186, 189 (2008) ("As a matter of civil service law, a RIF taken for reasons personal to an employee is an adverse action."). Nonetheless, Appellants and other similarly situated individuals were identified to OPM for their

11

purported association with "DEI" due to the anti-DEI EOs and OPM guidance. OPM's January 21, 2025 guidance specifies that agencies must report to OPM a list of *"employees* who [were in DEIA offices] **as of November 5, 2024**." Ex. 5 (emphasis original). This language indicates that *employees*, rather than *positions*, were targeted for removal, in violation of law and regulations governing RIFs.

Third, the Agency misrepresented the "dissolution" of CRCL in order to deny Appellants transfer or bump and retreat rights in violation of 5 C.F.R. Part 351, Subparts C-E. In Appellants' RIF notices, the Agency informed them that they were not eligible for reassignment because CRCL was being dissolved by the RIF. Ex. 1(D); Ex. 2(D). According to Agency leaders, however, Appellants' statutorily mandated functions will be preserved, with the work performed by new hires. *See supra* Part II.A.

Announcing the dissolution of CRCL to justify the elimination of federal employees is a violation of both the spirit and the letter of the law governing RIFs. Regulations governing RIFs make clear the government's interest in preserving, to the extent possible, the employment of federal workers even when positions are being eliminated. If functions from a competitive area that will be eliminated in a RIF are continued by being transferred to a new competitive area, the employee(s) performing those functions must transfer with the functions—and not be separated through the RIF. 5 C.F.R. § 351.302. If positions remain in the competitive area, those positions must be filled by employees from the competitive area through a system of bump and retreat rights detailed in the law and regulations governing RIFs. 5 C.F.R. § 351.701. The facts in this case show that, at the least, that the Agency represents that the statutorily mandated functions located in CRCL before the initiation of the RIF will continue after the RIF, despite the announced dissolution of CRCL. Whether the Agency styles this a transfer of functions outside

12

the competitive area (governed by 5 C.F.R. Part 351, Subpart C) or the retention of a limited

number of positions within the competitive area (and so subject to bump and retreat rights,

governed by 5 C.F.R. Part 351, Subpart G), the positions—now advertised on USA Jobs and

apparently elsewhere—should have been filled by competitive service employees like

Appellants, who, previous to the RIF, held positions within CRCL. DHS's use of a RIF to target

and eliminate employees violates the law governing RIFs.

Appellants were denied transfer rights, although the Agency states that their job functions

will be transferred to new positions, in direct contravention of 5 C.F.R. § 351.301-303. Transfer

of the employee to the new competitive area where the eliminated function will be performed is

not discretionary:

> "Before a reduction in force is made in connection with the transfer of any or all of the functions of a competitive area to another continuing competitive area, each competing employee in a position identified with the transferring function or functions *shall be transferred* to the continuing competitive area without any change in the tenure of his or her employment."

*Id.* (emphasis added).

███████████████████████████████████████████████████

Stephanie Fell's functions supported statutorily mandated functions. Ex. 8 at ¶ 6-7. Agency

officials recently gave testimony that statutorily mandated positions will continue after the RIF.

Ex. 12 at ¶ 13. Other functions too, apparently will continue as well in CRCL.[7] Troup

Hemenway, the Principal Deputy Chief of Staff at the U.S. Department of Homeland Security

and Acting Officer for Civil Rights and Civil Liberties, recently declared under oath that he

anticipates that the staffing of CRCL, after the elimination of all competitive civil servants

---

[7] Mr. Hemenway testifies that he anticipates that "The Deputy CRCL Officer will be the lead for EEO matters," implying that EEO matters will not be the sum total of the work CRCL performs post-RIF. Ex. 13 at ¶ 4.

13

through the RIF, will comprise himself, "as the Acting CRCL Officer, the Deputy CRCL Officer, an additional twenty full-time employees to handle casework, and an additional employee to handle report writing and any additional responsibilities." Ex. 13 at ¶¶ 1, 4. Nevertheless, by conducting no analysis of functions that will continue prior to implementing the RIF, and by failing to transfer any employee performing those functions, the Agency has violated RIF regulations. 5 C.F.R. § 351.302-303.

Alternatively, to the extent CRCL remains and the competitive area is not abolished, but instead positions remain within the same competitive area, Appellants and similarly situated federal employees were denied the right to bump and retreat into these positions. 5 C.F.R. § 351.701(a). Instead, the Agency manipulated the competitive area of the RIF to prevent Appellants and similarly situated individuals from reassignment via bump and retreat, in violation of 5 C.F.R. § 351.402(b) and § 351.701(a). Appellants' RIF notices described the competitive area as "CRCL", with distinct geographical areas for each Appellant (Washington, D.C. for Appellant Fell and Lawrenceville, Georgia for Appellant Pyatt), and stated that the reduction in force was "a result of the dissolution of [the] Office of Civil Rights and Civil Liberties (CRCL)." Ex. 2(D); Ex. 1(D).

The definition of CRCL as the competitive area is also subject to challenge.[8] OPM had ordered agencies "to define the competitive area solely in terms of the DEIA office where the employees worked." Ex. 6. The Agency has testified that it made special application to OPM for permission to redefine the competitive area for purposes of this RIF and received OPM's approval on March 7, 2025. Ex. 13 at ¶ 5; *see* § 351.402(c) (requiring that, "[w]hen a competitive

---

[8] Appellants will seek in discovery the Agency's applications to OPM justifying the revision of the competitive area for this RIF.

14

area will be in effect less than 90 days prior to the effective date of a reduction in force, a description of the competitive area shall be submitted to OPM for approval in advance" and *such descriptions must be readily available for review.*" (emphasis added)). RIF regulations require that a competitive area "be defined solely in terms of the agency's organizational unit(s) and geographical location" 5 C.F.R. § 351.402(b). Additionally, the "minimum competitive area is a subdivision of the agency under separate administration within the local commuting area." *Id.* The Agency has not explained in what way CRCL is an appropriate subdivision of the Agency under separate administration, nor why it was necessary to apply to OPM for a deviation from the Agency's established competitive areas in order to effectuate this reduction in force.

Defining the competitive area for the RIF as CRCL, the Agency held out—falsely, as Agency testimony now shows—that every competitive service position within the newly defined competitive area would be abolished. In fact, by continuing CRCL functions in new positions following the RIF, Agency officials make clear that the purpose of the RIF was to ensure the elimination of the *employees*. This manipulation of the competitive area to prevent reassignment, along with the denial of transfer rights when Appellants' position functions were transferred, are evidence that Appellants were targeted *personally* for removal from federal service due to the government's identification of them as being associated with "DEI."

The Agency's declaration of the dissolution of CRCL in Appellants' RIF notices contrasts with their admission that it has planned for approximately 20 positions to remain in CRCL following the RIF. Ex. 13 at ¶ 4. The Agency denied competitive civil servants in CRCL rights and protections they are guaranteed under the law under 5 C.F.R. § 351, as discussed above, when it conducted the RIF of DEI-associated employees in CRCL. Violation of RIF procedures and, particularly, targeting *specific employees*—such as Appellants and similarly

15

situated class members—for elimination because they were identified as being part of what the Agency or OPM decided was "DEI" is illegal and the reduction in forces should be reversed.

### 2. Appellants' Removals Constitute Unlawful Discrimination Based on Race and/or Sex, a Prohibited Personnel Practice

In removing Appellants pursuant to the anti-DEI EOs and because Respondents identified them as DEI-affiliated, the Agency disproportionately singled out for involuntary separation federal workers who are not male or white, in violation of 5 U.S.C § 2302(b)(1)(A) and Title VII.

The precise demographic data for employees working in the federal government or DHS who held positions eliminated pursuant to the anti-DEI EOs or because Respondents identified them as DEI-affiliated is not known but is ascertainable. OPM in its January 21, 2025 memo required agencies to provide "a complete list of DEIA offices and any employees who [sic] in those offices as of November 5, 2024." Ex. 5. Appellants were told they were on the lists DHS provided to OPM. Ex. 9 ¶ at 7; Ex. 8 at ¶ 10. The lists from DHS and other agencies, provided to OPM in response to OPM's guidance, will identify employees targeted under the anti-DEI EOs and demographic data may be gleaned from EEO-1 reports gathered through discovery. In anticipation of this more precise evidence and based on Appellants' investigation and the outreach Counsel received from putative class members, it can reasonably be expected to establish a disparate impact on women and persons of color like Appellants. Ex. 8 at ¶ 13; Ex. 9 at ¶ 10.

Appellants were further unlawfully subject to RIFs due to the perception that their work—perceived to be connected in some way with "DEI"—involved association with, advocacy on behalf of, or identification as a member of protected groups, such as women, people

16

of color, individuals with disabilities, and LGBTQ people, violating both 5 U.S.C § 2302(b)(1)(A) and Title VII. Courts have long recognized that advocacy for members of a protected class may give a plaintiff standing to sue for discrimination. *See e.g. Barrows v. Jackson*, 346 U.S. 249, 259 (1953) (white homeowner who may be "the only effective adversary" to a restrictive covenant has standing); *Sullivan v. Little Hunting Park, Inc.* 396 U.S. 229, 237 (1969) (abrogated on other grounds) (in a 42 U.S.C. § 1982 case, holding that a White homeowner may not be punished for "trying to vindicate the rights of minorities protected by s 1982."). The Sixth Circuit held that a white admissions officer at a university had standing to bring a discrimination claim based on his advocacy for affirmative action for women and racial minorities. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000). In the same circuit, school employees engaged in protected activity "by challenging the school's deficient administration of a free appropriate public education." *Kirilenko-Ison v. Board of Education of Danville Independent Schools*, 974 F.3d 652, 663 (6th Cir. 2020), citing *Reinhardt v. Albuquerque Public Schools Bd. Of Educ.*, 595 F.3d 1126, 1132 (10th Cir 2010); *Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 823, 828 (9th Cir. 2009) (same); *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 75–76, 78 (4th Cir. 2016) (same, in dictum).

Appellants are women, and █████████████████████ who worked CRCL performing statutorily mandated work. Nevertheless, they were targeted for separation from federal service because of their perceived association with DEI. Ex. 8 at ¶ 13; Ex. 9 at ¶ 10. They were targeted because Respondents imputed to them advocacy for initiatives addressing issues of diversity, equity and inclusion in the workplace. Illegal discriminatory animus motivated in part the targeting of Appellants and members of the putative class for inclusion in the challenged RIF.

     **3.**     **Appellants' Removals Constitute Unlawful and Unconstitutional Political**

### Discrimination

Appellants removals from federal service under a procedurally defective reduction in force, deliberately designed to deny Appellants and similarly situated individuals transfer or bump and retreat rights so as to force their separations, constitute unlawful and unconstitutional political discrimination.

Appellants' separations are unlawful political discrimination, prohibited personnel practices under 5 U.S.C. §§ 2302(b)(1)(E) and (b)(3). Discrimination on the basis of presumed or perceived political affiliation is illegal. Employees and applicants "should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation." 5 U.S.C. § 2301(b)(2). They should be protected against "coercion for partisan political purposes." § 2301(b)(8)(A). A supervisor is specifically enjoined from taking any personnel action on the basis of political affiliation. § 2302(b)(1)(E). Additionally, the coercion of political activity of any kind by a supervisor is prohibited, as is any sort of reprisal for an employee's refusal to engage in any political activity. § 2302(b)(3)

This partisan political discrimination similarly violates the First Amendment to the U.S. Constitution and 5 U.S.C. § 2302(b)(12), by targeting for elimination from federal service Appellants and other members of the putative class due to their presumed partisan political affiliations. *See Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980). The infringement of these rights violates Merit System Principles. 5 U.S.C. § 2301(b)(2) and (b)(8)(A.

President Trump has explicitly associated DEI programs with his Democratic predecessor, Joseph R. Biden and with the political party he opposes. The anti-DEI EOs are explicit in setting out to "eradicate" the DEI work imputed to the Biden presidency. Most

18

notably, President Trump has repeatedly called DEI work the function of a "leftist ideology" and a "woke" political agenda, and EO 14151 explicitly tied DEI programs to the Democratic party: "The Biden Administration forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government." Ex. 3 § 1; *see, e.g.*, The Washington Post, *Trump: 'Our country will be woke no longer'* (Mar. 4, 2025);[9] Speech of Donald J. Trump, Agenda47: Reversing Biden's EO Embedding Marxism in the Federal Government, Mar. 2, 2023 ("Joe Biden recently signed a very sinister executive order [on DEI]. . .With this action, Biden is weaponizing every tool of government power to push this racism and this Communism and Marxism, or whatever you want to call it.").[10]

The anti-DEI EOs and implementing guidance target workers connected in any way with DEI. OPM guidance issued to all federal agencies on the implementation of the anti-DEI EOs ordered agencies to file a report containing the names of every person working in "DEI" as of November 5, 2024. Ex. 5 at 2. In the same guidance, OPM ordered agencies to prepare to RIF the people so identified. *Id.* November 5, 2024, is the date of the federal election that returned Donald Trump as president. Backdating the request to identify DEI workers to that date makes explicit the political motivations of the project. The guidance further instructs agencies to inform staff to report any attempts to "disguise" DEI programs since November 5, 2024:

> We are aware of efforts by some in government to disguise these programs by using coded or imprecise language. If you are aware of a change in any contract

---

[9] The Washington Post, *Trump: Our country will be woke no longer* (March 4, 2025), https://www.washingtonpost.com/video/politics/trump-our-country-will-be-woke-no-longer/2025/03/04/b1daf287-4e6e-4edc-929a-5bf330ee8b16_video.ht ml.

[10] Donald J.Trump.Com, *Agenda47: Reversing Biden's EO Embedding Marxism in the Federal Government* (March 2, 2023), https://www.donaldjtrump.com/agenda47/agenda47-reversing-bidens-eo-embedding-marxism-in-the-federal-government.

description or personnel position description since November 5, 2024 to obscure the connection between the contract and DEIA or similar ideologies, please report all facts and circumstances to DEIAtruth@opm.gov within 10 days.

Ex. 5 at 3. OPM's guidance inviting insider reports of agency actions under the previous, politically opposed administration makes clear the anti-DEI EOs were not attempting to reset priorities for a new administration, but rather to single out and punish those it perceived to support its political opponents.

The Agency's ruse in declaring the dissolution of CRCL is a further demonstration that the RIF was an unlawful pretext to justify removing the federal workers occupying positions in CRCL. *See, e.g,* Ex. 11 at ¶¶ 3, 6–7; *Sahni v. District of Columbia Gov't,* 4 M.S.P.R. 170, 172 (1980) ("the Board will not allow the circumvention of adverse action procedures where the agency's stated reason is in reality a pretext for summary removal") (cleaned up). The Agency's deliberate misrepresentation of the status of CRCL in order to facilitate the quick separation of federal employees through a RIF is evidence that the RIF was a pretext to eliminate from federal service those affiliated with DEI for their perceived political affiliations and replace them with new hires.

Finally, the Agency's redefinition of the competitive area of the RIF to encompass only CRCL and so deny employees any chance of bump and retreat rights, Ex. 13 at ¶ 5, again shows that the Agency's interest was not in reshaping the workforce but in removing from the federal employees with any association with the DEI programs associated with President Biden.

In their respective roles at CRCL, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 1(B); Ex. 9 at ¶ 4, and Appellant Fell was a Supervisory Program Analyst, Ex. 2(B); Ex. 8 at ¶ 5. Neither was in a role designated as "DEI." Ex. 8 at ¶ 12; Ex. 9 at ¶ 9. Their targeting in response to the anti-DEI EOs and because they were identified as DEI-affiliated employees

makes clear that the anti-DEI EOs and OPM guidance applied an expansive definition of DEI that presumed political affiliation based on job assignment. *See* Ex. 9 at ¶ 7; Ex. 8 at ¶ 10.

The EOs were implemented to ensure that no workers *previously* doing what the government deemed "DEI" work continued serving anywhere in the federal government, in other capacities, even when the regulations governing RIFs mandate that they have access to positions within their competitive area and level. As discussed *supra* Part II(A),

The concerted effort of the Agency to ensure the separation of workers engaged in DEI at any time since the federal election on November 5, 2024, demonstrates the political discrimination driving the RIF and its use to target workers instead of positions. Reporting DEI workers to OPM so that they can be targeted for separation pursuant to a RIF, redefining the competitive area of the RIF and declaring the abolition of CRCL to prevent any from avoiding the RIF, while admitting that CRCL will, in fact, continue, all demonstrates the focus on punishing federal workers who were judged to have *ever* worked in

DEI. This violation of the both the First Amendment and 5 U.S.C. §§ 2302(b)(1)(e) and (b)(3) itself violates Merit System Principles 2 and 8(A), 5 U.S.C. §§ 2301(b)(2) and (8)(A), and in doing so constitutes a prohibited personnel practice under 5 U.S.C. § 2302(b)(12). The infringement of Appellants' associational rights violates Merit System Principle 2, 5 U.S.C. § 2301(b)(2):

> All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights[;]

and Merit System Principle 8(A), 5 U.S.C. §§ 2301(8)(A): "Employees should be . . . protected against arbitrary action, personal favoritism, or coercion for partisan political purposes[.]" 5 U.S.C. § 2301(b)(2) and (8)(A). *See* 5 U.S.C. § 2302(b)(12) (agencies shall not "take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title"). The Agency denied Appellants "fair and equitable treatment" by removing them from their positions based on perceived political affiliation with DEI and without an opportunity for reassignment or transfer, *see supra* Part B(1). Appellants' removals on the basis of perceived political affiliation with President Trump's predecessor plainly constituted "arbitrary action . . . for partisan political purposes[.]" 5 U.S.C. § 2301(b)(2) and (8)(A). These violations of the First Amendment, 5 U.S.C. §§ 2302(b)(1)(e) and (b)(3), and Merit System Principles 2 and 8(A) ultimately amounted to an illegal prohibited personnel practice under 5 U.S.C. § 2302(b)(12).

Removing from federal service through a RIF those employees identified as DEI-affiliated violates the First Amendment rights of those employees (a violation of 5 U.S.C. §

2302(b)(12)); violates Merit System Principles in 5 U.S.C. §§ 2302(b)(1)(e) and (b)(3); and abuses the laws and regulations governing RIFs by using that mechanism to punish perceived political opponents and to coerce conformity with their own political positions. By removing Appellants (and similarly situated class members) in a manner that denied them (and class members) opportunities to transfer, the Respondents have shown that their reliance on "the dissolution of the Diversity, Equity, Inclusion & Accessibility program" is pretextual and merits no deference.

### 4.    Appellants' Removals Violate the APA

The authorizing legislation of DHS is explicit that the Agency must maintain the Civil Rights and Civil Liberties functions performed by Appellants. 6 U.S.C. § 345. Furthermore, Appellant Pyatt worked on congressionally-mandated EEO work under the Civil Rights Act of 1964 and CRCL's authorizing statute. 42 U.S.C. § 2000e-16; 6 U.S.C. § 354(a)(1), (6). By removing Appellants from this mandated work, the Agency has thwarted Congress's clear directive. Section 706(1) of the APA provides that a tribunal "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Moreover, the tribunal must "hold unlawful and set aside agency action . . . found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The RIFs must be rescinded and the Appellants restored to their mandated jobs.

## III.    APPELLANTS REQUEST THAT THIS MATTER BE HEARD AS A CLASS APPEAL UNDER 5 C.F.R. § 1201.27

Appellants bring this appeal on behalf of the class of all persons who were subject to separation from federal service due to Executive Order 14151 ("EO 14151"), *Ending Radical*

*and Wasteful Government DEI Programs and Preferences*, Executive Order 14173 ("EO 14173"), *Ending Illegal Discrimination and restoring Merit-Based Opportunity*, and/or because the government associated them with the concepts of "diversity, equity, and inclusion" and/or "diversity equity, inclusion, and accessibility" between January 20, 2025 and the first day of a hearing on Appellants' and putative class members' claims.

The Board's class appeal regulations provide that when an appellant requests class certification, "[t]he judge will hear the case as a class appeal if he or she finds that a class appeal is the fairest and most efficient way to adjudicate the appeal and that the representative of the parties will adequately protect the interests of all parties." 5 C.F.R. § 1201.27(a). The regulations further provide that "[i]n determining whether it is appropriate to treat an appeal as a class action, the judge will be guided but not controlled by the applicable provisions of the Federal Rules of Civil Procedure." *Id.* § 1201.27(c).

Federal Rule of Civil Procedure 23(a) sets out four prerequisites for class certification:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

A class may be maintained if Rule 23(a) is satisfied and the requirements for at least one of the following categories in Federal Rule of Civil Procedure 23(b) is met:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the

party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Alternatively, "an action may be brought or maintained as a class action with respect to

particular issues." Fed. R. Civ. P. 23(c)(4).

The proposed class satisfies all prerequisites for class certification under Federal Rule of

Civil Procedure 23 and thus 5 C.F.R. § 1201.27.

### A.    The Proposed Class Satisfies the Numerosity Requirement

A class is sufficiently numerous under Rule 23(a)(1) if its size makes joinder

impracticable. While there is no specific numeric threshold, the federal district court in the

District of Columbia has held that "[a]bsent unique circumstances, 'numerosity is satisfied when

a proposed class has at least forty members." *Coleman v. District of Columbia*, 306 F.R.D. 68,

76 (D.D.C. 2015); *see also Equal Emp. Opportunity Comm'n v. Printing Indus. of Metro. Wash.,*

*D.C., Inc.*, 92 F.R.D. 51, 53 (D.D.C. 1981) ("[T]he Court notes that as few as 25-30 class

members should raise a presumption that joinder would be impracticable, and thus the class

should be certified.").

Based on publicly available information and Appellants' own investigation, the class size

well exceeds 40. *See, e.g.*, Sara Dorn, "Federal Government Layoff Tracker: State Department

Reportedly Cutting 15% Of U.S. Staff, EPA Firing DEI Workers," FORBES (Apr. 22, 2025) (describing firing or reassignment of 280 employees performing DEI at the Environmental Protection Agency);[11] Eric Katz, "White House collects lists of federal DEI office employees as punishments begin," GOVERNMENT EXECUTIVE (Jan. 27, 2025) (describing placement on leave of 60 employees in DEI roles at the Department of Veterans Affairs).[12]  In addition, as noted above, OPM ordered all agencies to provide "a complete list of DEIA offices and any employees who [worked] in those offices **as of November 5, 2024**[.]" Ex. 5 at 2. OPM further ordered agencies to begin issuing RIF notices to employees in DEI offices so identified. Ex. 5. Thus, Appellants assert that the class comprises at least those federal workers identified in response to EO 14151, EO 14173, and OPM's implementing guidance. Competitive service employees who received notice that they would be separated from federal service by RIF, effective on or after May 21, 2025, in accordance with EO 14210, and/or because they were understood to be DEI-affiliated, also fall within this class. Their identities are discoverable through the Agency's identification of all employees who received a similar notice of removal.

The size of the proposed class is thus reasonably judged to be well beyond that for which joinder would be practicable.

> **B.      The Proposed Class Is Sufficiently Cohesive to Warrant Adjudication by Representation**

---

[11] Forbes, Federal Government Layoff Tracker: State Department Reportedly Cutting 15% Of U.S. Staff, EPA Firing DEI Workers (Apr. 22, 2025), https://www.forbes.com/sites/saradorn/2025/04/22/federal-government-layoff-tracker-state-department-reportedly-cutting-15-of-us-staff-epa-firing-dei-workers/.

[12] GovExec, White House collects lists of federal DEI office employees as punishments begin (Jan. 27, 2025), https://www.govexec.com/workforce/2025/01/white-house-collects-lists-federal-dei-office-employees-punishments-begin/402534/#:~:text=The%2520Veterans%2520Affairs%2520Department%2520on%2520Monday%2520reported,as%2520laid%2520out%2520in%2520earlier%2520OPM%2520guidance.&text=An%2520exhaustive%2520list%2520with%2520detailing%2520the%2520number,employees%2520represents%2520about%25200.01%25%2520of%2520its%2520workforce.

Under Rule 23, the commonality requirement asks whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 759 (D.C. Cir. 2023). The requirement is met if the class's claims "depend on a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019) (alteration in original) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Individual variation among the class does not defeat commonality; what matters to class certification is the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 564 U.S. at 350.

While not a factor for certification under Rule 23(b)(2), the predominance inquiry of Rule 23(b)(3) "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks and citation omitted).

> When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Id.* (internal quotation marks and citation omitted).

The pertinent legal questions at issue here that are common to the class include: (1) whether Respondents' RIF Actions, conducted pursuant to EOs 14151 and 14173 and OPM's January 21 and 24, 2025 implementing guidance, and/or pursuant to the identification of employees as DEI-affiliated, violate RIF procedures required by 5 C.F.R. Part 351; (2) whether the RIF actions pursuant to the EOs intentionally discriminated against or disparately impacted

27

federal workers who are not white or male in violation of Title VII and 5 U.S.C. § 2302(b)(1)(A); (3) whether the RIF actions pursuant to the EOs unlawfully punished employees by removing them and/or denying them reassignment because of their perceived or presumed political affiliation in violation of the First Amendment to the U.S. Constitution and the Merit System Principles described in 5 U.S.C. §§ 2301(b)(2) and (8)(a), in violation of 5 U.S.C. § 2302(b)(12); and (4) whether the RIF actions violated the APA by eliminating functions mandated by Congress.

Common answers to these questions—central to each class member's appeal—require common proof and do not depend on individual variation among the class. Federal Rule of Civil Procedure 23(a)(2), which informs the Board's class certification standard,[13] requires only that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *Harris*, 77 F.4th at 759. The requirement is met if the class's claims arise from a common policy or practice that gives rise to shared legal questions. *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019) (explaining that the requirement is met where "claims depend upon a common contention . . . of such a nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.") (quoting *Wal-Mart*, 564 U.S. at 350). Individual variation among the class does not defeat commonality; "even a single common question" will do where "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350; *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (holding that where "one or more of the central issues in the action are common to the class," class certification is

---

[13] *See* C.F.R. § 1201.27(c) ("In determining whether it is appropriate to treat an appeal as a class action, the judge will be guided but not controlled by the applicable provisions of the Federal Rules of Civil Procedure.").

appropriate "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members").

The existence of a common policy that "applies on uniform grounds applicable to every member of the class" satisfies the commonality requirement. *Azar*, 925 F.3d at 1321; *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Where the same conduct or practice. . . gives rise to the same kind of claims from all class members, there is a common question."); *Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014) ("Where plaintiffs allege widespread wrongdoing by a defendant, a uniform policy or practice that affects all class members bridges the gap."); *see also Stockwell v. City & County of San Francisco*, 749 F.3d 1107 (9th Cir. 2014) (reversing denial of certification of class of police officers who challenged uniform promotion policy).

The D.C. Circuit's decision in *J.D. v. Azar* is instructive. There, pregnant unaccompanied minors in federal custody challenged a uniform government policy that effectively precluded minors from obtaining an abortion. 925 F.3d at 1299. The government argued that commonality was lacking because of the "factual variations among the class members—namely, their age, maturity, stage of pregnancy, mental health, length of sponsorship search, and ability to return to the country of origin." *Id.* at 1321. The court rejected that argument, holding that commonality was satisfied because the policy applied uniformly to every member of the class, "regardless of the circumstances of her pregnancy" and raised a common legal question, namely, whether the policy was lawful. *Id.* Indeed, the court emphasized that, "the class members assert an entitlement to relief that is entirely unaffected by the myriad factual differences noted by the government," *id.*, and the common questions are "apt to drive the resolution of the litigation," *id.* (quoting *Wal-Mart*, 564 U.S. at 350); *see also Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952,

29

963 (9th Cir. 2013) (concluding that the "legality of a policy" is a "significant question of law" that is "apt to drive the resolution of the litigation"); *Custom Hair Designs by Sandy v. Cent. Payment Co.*, LLC, 984 F.3d 595, 601 (8th Cir. 2020) (finding that common questions and answers predominated where all class members' claims "deal with either a common scheme of fraud or a term common to all contracts" even though some negotiated terms of the contract differed amongst class members).

Commonality can also be established where the class members challenging a policy work at different facilities, with different leaders, or across geographic regions. *See, e.g., McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488-89 (7th Cir. 2012) (finding commonality satisfied where plaintiffs challenged two specific company policies as having a disparate impact on Black brokers, even though the class members worked across the company's 600 branch offices throughout the country); *see also Parra v. Bashas', Inc.*, 291 F.R.D. 360, 365-66 (D. Ariz. 2013) (certifying class of all Hispanic employees at three different grocery chains operating in different markets where plaintiffs produced evidence of companywide pay scales); *In re High-Tech Employee Antitrust Litigation*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) (certifying class of employees despite significant job and geographic variation where common anticompetitive wage suppression was alleged); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 510 (N.D. Cal. 2012) (commonality satisfied in national class action where class members worked in different geographic regions because they were all subject to a common, companywide promotion system).

Appellants challenge a governmentwide policy to fire a large group of employees, including Appellants, because the government associated them with diversity, equity, and inclusion. That decision flowed from two specific Executive Orders. The questions that will

30

"generate common answers apt to drive the resolution of the litigation," *Wal-Mart*, 564 U.S. at 350, relate to this *policy*, not to the "different agencies and/or . . . different geographic regions and commuting areas" in which potential class members work.

The question of superiority asks whether "resolution by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness.'" *Black Lives Matter D.C. v. United States*, 2025 WL 823903, at *15 (D.D.C. Mar. 14, 2025) (quoting *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 313 (D.D.C. 2007)). Ultimately, the rule "militates in favor of class actions where common legal or factual questions allow a court to 'consolidate otherwise identical actions into a single efficient unit.'" *Id.* at *16 (quoting *Barnes v. District of Columbia*, 242 F.R.D. 113, 123 (D.D.C. 2007)).

In this case, where class members present nearly identical legal claims involving the same common directives, the class action device offers a more efficient and consistent mechanism for resolution than *in seriatim* actions by each class member. Indeed, requiring each affected employee to bring a separate appeal raising the same threshold challenges risks inconsistent or varying adjudications that would establish incompatible standards of conduct for agencies.

Federal courts have held that a class action may proceed even if only a single plaintiff is identified at the outset.[14] *See* Fed. R. Civ. P. 23(a)(1) (requiring only that "the class is so numerous that joinder of all members is impracticable," not that each member be named); *see*

---

[14] Of course, Appellant seeks to represent a large number of employees—comprising, at least, those federal workers identified by their agencies in response to Executive Orders 14151 and 14173 and OPM's implementing guidance. As such, the class also undoubtedly satisfies the numerosity requirement. *See* 1 Newberg and Rubenstein on Class Actions § 3:12 (6th ed.) (class of 40 or more is presumptively impracticable for joinder).

*Burks v. Islamic Republic of Iran.*, No. 16-CV-1102 (CRC), 2022 WL 20588923, at *14 (D.D.C. Sept. 30, 2022) (holding that the D.C. Circuit does not recognize an ascertainability requirement); *see also Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 404 (D. Md. 2023) (finding that "it is not necessary to identify every class member at the time of certification"); *Jarznya v. Home Props., L.P.*, 321 F.R.D. 237, 240 (E.D. Pa. 2017) (determining that the ascertainability requirement "does not mean that a plaintiff must be able to identify all class members at class certification"); *Lutz Surgical Partners PLLC v. Aetna, Inc.*, No. CV 15-2595-BRM-TJB, 2023 WL 2153806, at *7 (D.N.J. Feb. 21, 2023) (finding that "a plaintiff need not identify every class member at the class certification stage"); *Stemple v. QC Holdings, Inc.*, No. 12-CV-01997-BAS WVG, 2014 WL 4409817, at *4 (S.D. Cal. Sept. 5, 2014) ("[T]he exact identities of class members do not need to be specified at the class certification stage[.]").

The MSPB's own regulations confirm that a class action may be initiated by "one or more" appellant or appellants. *See* 5 C.F.R. § 1201.27(a). Moreover, Appellants expect that, if discovery is permitted on the issue of class certification, they will obtain evidence of additional possible class members.

Moreover, given that litigation costs may exceed the damages recoverable by any one appellant, pooling claims will permit all affected employees to pursue claims "which [c]ould be uneconomical to litigate individually." *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 809 (1985). The experience of class counsel also suggests that this action will be a superior device for managing and resolving the putative class action.

C.    **Appellants' Claims Are Typical of the Class Claims**

Typicality differs from commonality in that it concerns the relationship between the proposed class representatives' claims and those of the class, rather than the relatedness of the

32

entire class's claims. *J.D.*, 925 F.3d at 1322. "Yet they '[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical.'" *Id.* (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). Typicality is thus ordinarily met "if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Id.* (internal quotation marks and citation omitted).

Here, a single event, involuntary separation from federal service pursuant to the anti-DEI EOs and because Appellants were identified as DEI-affiliated, unites Appellants and all class members. Appellants were deprived of their rights in the same manner as the class and seek the same relief. Moreover, Appellants' legal arguments are common to the other class members. *Supra* Part III.B.

### D.    Appellants Are Adequate Class Representatives

"The adequacy requirement aims to ensure that absent class members will not be bound by the outcome of a suit in which they were not competently and fairly represented." *J.D.*, 925 F.3d at 1322 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.")). Rule 23(a)(4)'s adequacy standard "embraces two components: the class representative (i) 'must not have antagonistic or conflicting interests with the unnamed members of the class' and (ii) 'must appear able to vigorously prosecute the interests of the class through qualified counsel.'" *Id.* (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).

Appellants will fairly and adequately represent the class. Appellants were removed from federal service in procedurally flawed RIFs undertaken because of the anti-DEI EOs and because

33

they were identified as DEI-affiliated, and Appellants have no interests in conflict with the class. In addition, under Rule 23(g), Appellants have retained appropriate counsel who have the knowledge, skills, and experience to represent the class.

## IV.    REQUEST FOR CLASS DISCOVERY AND BRIEFING SCHEDULE

Wherefore Appellants appeal their removal from federal service, request a hearing, and ask that this appeal be processed as a class appeal on behalf of all federal workers separated from federal service due to the anti-DEI EOs and/or because the government associated them with the concepts of DEI between January 20, 2025, and the first day of a hearing on Appellants' or putative class member's claims.

The determination of whether to certify a class requires a "rigorous analysis" to ensure "[a]ctual, not presumed, conformance" with certification requirements. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). As such, the "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* Courts therefore routinely grant pre-certification discovery[.]" *See Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 89-90 (D.D.C. 2013) ("[C]ourts rarely grant motions to dismiss or strike class allegations before there is a chance for discovery."); *Bird v. Garland*, CA No. 19-1581 (JMC), 2022 WL 22910884, at *3 (D.D.C. Aug. 20, 2022) ("[I]t would be pretty extraordinary for a court to grant a motion to dismiss or strike class allegations before plaintiffs have had a chance for discovery.").

Here, pre-certification discovery is warranted. Accordingly, Appellants request that the Administrative Judge set a briefing schedule on the issue of whether a class should be certified under 5 C.F.R. § 1201.27 and, prior to briefing this issue, order a 30-day discovery period for purposes of developing the record on class certification. Information relevant to class

certification will include:

1.    The Agency and each federal agency's "complete list of DEI offices and any employees who [work] in those offices **as of November 5, 2024**" or employees otherwise identified for RIF due to alleged DEI work, including but not limited to, as provided to OPM pursuant to its January 21, 2025, guidance. Ex. 4 at 2 (emphasis in original).

2.    Lists of employees at the Agency and each federal agency subject to DEI-related administrative leaves and those subject to RIFs, containing name, title at the time of separation, GS-level, job duties, and office.

3.    The race and gender of persons listed in 2.

4.    Communications and guidance from OPM to the Agency and each federal agency relating to the identification of positions to be targeted for RIFs pursuant to EOs 14151, 14173, and/or 14210.

5.    The Agency and each federal agency's communications (both internally and between agencies, including but not limited to memoranda, directives, emails, or Teams messages), relating to the identification of positions to be targeted for administrative leaves or RIFs pursuant to EOs 14151, 14173, and/or 14210.

6.    Retention registers for all DEI-related RIFs at the Agency and each federal agency.

7.    Race and sex demographics at the Agency and each federal agency (*e.g.*, overall workforce percentages of men vs. women, and Caucasian/Black/Hispanic-Latino/AAPI/Native-Indigenous).

8.    Records establishing or changing competitive areas and published descriptions at the Agency and each federal agency.

9.      Contact information for notice purposes of those identified in response to 2.

Appellants propose the following schedule:

- 30 days for discovery on class issues;

- Appellants' brief in support of class certification due 15 days after the close of discovery;

- Any brief in opposition to class certification due 15 days after submission of Appellants' brief in support of class certification; and

- Appellants' reply brief due 10 days after submission of any brief in opposition to class certification.

Respectfully submitted,

Mary E. Kuntz

Mary E. Kuntz (D.C. Bar No. 1000482)
Anna Kathryn B. Barry (D.C. Bar No. 1719493)
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave., NW, Suite 1000
Washington, D.C. 20006
Tel.: (202) 331-9260
Fax: (866) 452-5789
mkuntz@kcnlaw.com
akbarry@kcnlaw.com

36

Respectfully submitted,

Mary E. Kuntz (D.C. Bar No. 1000482)
Anna Kathryn B. Barry (D.C. Bar No. 1719493)
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave., NW, Suite 1000
Washington, D.C. 20006
Tel.: (202) 331-9260
Fax: (866) 452-5789
mkuntz@kcnlaw.com
akbarry@kcnlaw.com

Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)
Simone Wallk (D.C. Bar No. 90028904)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
Tel.: (202) 457-0800
smichelman@acludc.org
ashah@acludc.org
swallk@acludc.org

*Attorneys for Appellants and the Proposed Class*

Kelly M. Dermody (D.C. Bar No. 90032320)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel.: (415) 956-1000
Fax: (415) 956-1008
kdermody@lchb.com

Jessica A. Moldovan (NY Bar No. 5615943)
Jahi J. Liburd (NY Bar No. 6015812)
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Tel.: (212) 355-9500
jmoldovan@lchb.com
jliburd@lchb.com